# Exhibit A



### *State of New Jersey*
OFFICE OF ADMINISTRATIVE LAW

<u>**FINAL DECISION**</u>

OAL DKT. NO. EDS 03372-22

AGENCY DKT. NO. 2022-34219

**HADDONFIELD BOROUGH**

**BOARD OF EDUCATION,**

     Petitioner,

          v.

**M.L. AND T.N. ON BEHALF OF J.N.,**

     Respondents.

_____

       **Robert A. Muccilli**, Esq., and **Sanmathi Dev**, Esq., for petitioner Haddonfield Borough Board of Education (Capehart & Scatchard, P.A., attorneys)

       **Jamie Epstein**, Esq., for respondents M.L. and T.N. on behalf of J.N.

Record Closed:  June 1, 2023          Decided:  June 29, 2023

BEFORE **TRICIA M. CALIGUIRE**, ALJ:

<u>**STATEMENT OF THE CASE**</u>

     This case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1401 to 1484(a) and 34 C.F.R. §§ 300.500 et seq. (2022).  Petitioner Haddonfield Borough Board of Education (Board) seeks (1) approval of the removal of J.N. from Haddonfield Middle School (HMS), Haddonfield Borough School District

(District), and his continued placement on home instruction pending an out-of-district alternative interim placement for the remainder of the 2021–2022 school year and the 2022–2023 school year; (2) an order directing respondents to make J.N. available for intake and/or screening interviews at Garfield Park Academy (Garfield) and/or the Hampton School (Hampton) and/or an alternate placement agreed to by the parties in connection with the consideration of J.N. for admission by Garfield and/or Hampton and/or an alternate placement; and (3)  placement of J.N. in an out-of-district setting, namely Garfield or Hampton or an alternate placement agreed to by the parties.

The basis for the Board's request is that by his behavior, J.N. presents a danger to himself and to others and substantially disrupts the educational environment within HMS.  Therefore, the Board contends that a highly structured educational environment providing intensive behavioral interventions is required to allow J.N. to obtain a free appropriate public education (FAPE).  Respondents M.L. and T.N. on behalf of J.N. oppose these requests on the grounds that the Board has failed to carry the burden of proving that J.N. presents a danger to himself and/or others and/or that an out-of-district placement will provide J.N. with a FAPE in the least restrictive environment (LRE).

Due to delays in prosecuting this matter (explained below), J.N. has been on home instruction for the 2022–2023 school year.  The issue for resolution remains whether the April 13, 2022, individualized education program (IEP), proposed by petitioner but not accepted by respondents, provides J.N. with a FAPE in the LRE.

## **PROCEDURAL HISTORY**

On April 27, 2022, the Board filed a complaint for an expedited due-process hearing and emergent relief with the New Jersey Department of Education (DOE), Office of Special Education Programs.  On April 28, 2022, the request for an expedited hearing was not granted, but was transmitted for a due-process hearing to the Office of Administrative Law (OAL).  At the same time, the emergent petition was transmitted to the OAL for an emergent-relief hearing.

OAL DKT. NO. EDS 03372-22

On April 29, 2022, M.L. and T.N. on behalf of J.N. filed a cross-petition for emergent relief with the OAL, seeking the immediate return of J.N. to HMS under the doctrine of stay-put.  Oral argument on emergent relief was held on May 2, 2022; following a May 2, 2022, submission by counsel for M.L. and T.N., who had made his appearance shortly before the emergent hearing, the record on emergent relief closed.  By order dated May 4, 2022, the Board's petition for emergent relief was granted.

Following the emergent hearing, it was determined that the original filing of the Board satisfied the requirements of a request for an expedited hearing in N.J.A.C. 1:6A-14.2(a)(1).  On May 9, 2022, I advised the parties that I would hear the matter of whether J.N. should be returned to his classroom or remain on home instruction on an expedited basis and scheduled the hearing for May 12, 2022, within twenty days of the original hearing request, pursuant to N.J.A.C. 1:6A-14.2(c).  Prior to May 12, 2022, counsel for respondents filed <u>two</u> motions arguing that expedited treatment was not appropriate in this matter, and, on reconsideration of my earlier ruling, I granted that request.

The due-process hearing was scheduled on the earliest date of the parties' mutual availability, June 23, 2022.  Three days before the hearing, respondents filed an "answer and counter-petition" in the form of a letter addressed to me, not the DOE.  The cover email addressed to the DOE was not included with the documents I received,[1] and I was therefore unaware that respondents filed a new petition until the hearing began and petitioners so advised me.  Even though the June 23, 2022, hearing was adjourned, and respondents later withdrew their counter-petition, petitioner chose to appeal, in federal court, earlier rulings I made regarding the "answer and counter-petition."[2]

The parties appeared for a number of status conferences while waiting for a ruling in federal court.  Only one transcript of proceedings in the federal matter before the Honorable Christine P. O'Hearn, U.S.D.J.,[3] was sent to me, that of February 2, 2023;

---

[1]  As I have stated previously, my judicial-support specialist made no mistake, and this information is offered only to explain how the confusion resulted.

[2]  In short, the "cross-petition" sought only the relief respondents would have been granted had they prevailed in the matter brought by the Board, essentially the opposite of the relief requested by petitioner. The only "new" request was for compensatory education, relief I could have granted without an express request by respondents.  For those reasons, I initially refused to adjourn the hearing.

[3]  <u>Haddonfield Borough Bd. of Educ. v. M.L. et al.</u>, Civil Action No. 22-04355 (U.S.D.C. February 27, 2023).

OAL DKT. NO. EDS 03372-22

Judge O'Hearn admonished respondents[4] for delaying this matter.  Judge O'Hearn dismissed the Board's appeal for lack of jurisdiction by order dated February 27, 2023.[5] The hearing was then scheduled for March 15 and 16, 2023, but adjourned at petitioner's request and over respondents' strong objections.

The hearing was held on March 22, 23 and 24, and April 19, 2023.[6]  Numerous motions made during the hearing were briefed and decided by letter orders, some of which are referenced below.  Oral summations were scheduled for May 15, 2023, but adjourned for respondents' emergent health reasons, and rescheduled for May 31, 2023. Oral summations were made by Zoom; petitioner also submitted its summation in writing the same day.[7]  With its written summation, petitioner moved to exclude respondents' last-submitted exhibit; that motion is addressed below.  On June 1, 2023, respondents submitted a written outline of their summation and a list of authorities, and the record closed.

## **FACTUAL DISCUSSION AND FINDINGS**

## **Background**

Most of the pertinent background facts in this matter are undisputed.  Based on the documents, including certifications as noted, filed in this matter between May 2022 and May 2023, I **FIND** as **FACTS**:

1.     J.N. is a fourteen-year-old male student who is eligible for special education (SE) and related services in the autistic classification category.   His treating

---

[4]  Petitioner noted that Judge O'Hearn criticized respondents for their failure to appear in a timely manner, thereby unnecessarily delaying the matter before her.  (See Petitioner's Post-Hearing Brief (May 31, 2023), at 38–39.)

[5]  Respondents stated repeatedly that Judge O'Hearn ordered me to complete this matter within thirty days of her order of dismissal; no such order is apparent on review of the order or of the transcripts provided.

[6]  Proceedings in this matter began by Zoom, but all COVID-19 restrictions on public gatherings had been lifted by March 2023.  The parties and most witnesses appeared in person; without objection, certain witnesses appeared via Zoom.

[7]  The manner in which I accepted summations was the subject of a post-hearing motion by respondents; the letter order on motions was issued May 23, 2023.

OAL DKT. NO. EDS 03372-22

psychiatrist also diagnosed J.N. with attention deficit hyperactivity disorder, anxiety, and disruptive mood dysregulation disorder (DMDD).  (J-12.)

2.      J.N., his mother, M.L., and older sister, A.N., moved into the Haddonfield School District (District) in September 2018.  In the 2018–2019 and 2019–2020 school years, J.N. attended private day schools for children with disabilities, pursuant to IEPs developed by the District child study team (CST).

3.      On December 6, 2019, the then-District director of Special Services sent M.L. and T.N. a proposal regarding J.N. for review at the January 10, 2020, reevaluation planning meeting, which stated in pertinent part:

> [T]he district proposed that no additional information is required to determine that the student continues to have a disability, and/or to develop an [IEP].  . . . Additional testing is not warranted and will not be conducted at this time. However, in accordance with N.J.A.C. 6A:14-3.8(b)(3) you may submit a written request to the district within 15 calendar days of receipt of this notice to ask for additional assessment(s) and the district must provide the additional assessment(s) to determine whether the student continues to be a student with a disability.
>
> [P-28.]

4.      In the January 10, 2020, IEP, the "sources of information used to develop the IEP" included two evaluations, a March 17, 2017, Functional Behavioral Analysis (FBA), and a January 9, 2014, social history/assessment.  (P-29.)

5.      By letter dated January 10, 2020, the day of the reevaluation planning meeting, the CST proposed to conduct educational and psychological evaluations of J.N.  (P-30.)  On February 21, 2020, with the consent of the parents, the District conducted the educational assessment of J.N., and the report of the educational assessment was issued on February 22, 2020.  (P-32.)

OAL DKT. NO. EDS 03372-22

6.      On or about February 24, 2020, with the consent of the parents, the District conducted the psychological evaluation of J.N.  The report of the psychological assessment was issued on March 12, 2020.  (P-31.)

7.      Prior to the beginning of the 2020–2021 school year, J.N. enrolled in sixth grade at HMS.

8.      By letter dated July 29, 2020, Dr. Carmen Henderson, District director of Special Services, stated that the CST proposed a Behavioral Observation of J.N., to which M.L. consented.  (P-35.)  Between August 23, 2020, and September 16, 2020, Brett DiNovi & Associates (BDA), an outside consultant retained by the District, conducted three direct observations, a record review, and an interview with M.L., and on September 5, 2020, issued Preliminary Behavioral Observations. (P-36.)   On September 25, 2020, BDA issued a final proposal with recommendations to support J.N.[8]  (P-37.)

9.      Neither party introduced the IEP describing J.N.'s program for the 2020–2021 school year.

10.     J.N. began the 2020–2021 school year on a hybrid schedule (due to COVID-19 restrictions).  Each week, he was at school three and one-half days and took instruction from home one and one-half days.  No evidence was presented of behavioral issues resulting in discipline during the 2020–2021 school year.

11.     On April 27, 2021, the CST met with respondents to develop the IEP for J.N.'s seventh-grade school year, September 8, 2021, through June 22, 2022.  (J-2.)  J.N. was placed in a general education (GE) class, where he received in-class support (ICS), supplementary instruction, speech and occupational therapy, and related services. A Behavioral Intervention Plan (BIP) was included.  (J-2 at 014.)  Initially, extended

---

[8]  The IEPs developed after this report was issued refer to the "Behavioral Observation of 9/5/2020," but both the preliminary recommendations and final report are signed and dated "9/25/2020."

school year (ESY) was not provided, but by amendment dated June 17, 2021,[9] ESY was added to address potential regression in "behavioral/emotional/social skills due to unstructured time." (J-2 at 043.)

12.    In the April 27, 2021 IEP, the "sources of information used to develop the IEP" are as follows:

- 9/5/2020 Behavioral Observation—J.N. would benefit from on-going [board-certified behavioral analyst (BCBA)] consultations, as well as a [personal care assistant] who has training in [ABA] and is receiving supervision under a BCBA. In addition, his family would benefit from parent training to address the following goals: "Parent will avoid vocal statements in response to challenging behavior across a minimum of 5/6 instances which behavior occurs for 4 consecutive weeks" and "Parent will refrain from delivery of high quality reinforcement on days when learner does not meet goal, across 90% of opportunities, for 4 consecutive weeks."

- 3/17/2017 Functional Behavioral Assessment—FBA

- 1/9/2014 Social History—social assessment

13.    The April 27, 2021, IEP does not cite the educational and/or psychological evaluations conducted by the District in 2020. Dr. Kristin Lerin, who conducted the psychological evaluation, was present at the IEP meeting; no comments in the IEP are attributed to her. (See J-2.)

14.    The concerns of the parent were summarized in the April 27, 2021, IEP as follows, in pertinent part:

- M.L. shared that J.N. had lower confidence [at the] beginning of the school year [and] she has seen his confidence increase during 6th grade. The [CST] shared that they have observed the same [and] gave multiple examples of how J.N. has

---

[9] During the hearing, the IEP in place for J.N. during the 2021–2022 school year was referred to witnesses and counsel by both dates, April 27 and June 17, 2021. Here, it will be referred to only by the first date, April 27, 2021.

increased his frustration tolerance, is engaging and cares about his performance.

- [Teachers] shared that [J.N.] has increased his positive interactions with peers [and] peers are enjoying him and they are respecting his insightfulness and sense [of humor]. . . . [J.N.] has not reported any peer struggles. [The BDA board-certified behavioral analyst assigned to J.N.] confirmed the positive relationships during unstructured time. During recess, he is playing and interacting positively with classmates.

- [M.L.] shared that she is worried about fading the support at this moment [because] if J.N. is acting out negatively, his peer relationships will be compromised. . . . Unstructured settings, such as gym, cafeteria, recess, and transitions have historically been his vulnerable settings.

- The IEP team discussed the need for parent consultation/training. M.L. shared that there are times when she may need more parent support [such as] at the beginning of the school year, she many need a lot of parent consultation/training, while later in the school year parents may not need support. The [CST] discussed options for how to provide flexibility with the hours of parent consultation/training provided during the next school year [and] it will be important that the parent consultation/training takes place during the school day.

15.     The description of J.N.'s "present levels of academic achievement and functional performance" includes the following:

Reading
On standardized assessments, J.N. excels with compare and contrast and evidence questions [but] sometimes he has difficulty focusing on big picture ideas and will often focus on minute details.

Writing
J.N. is able to construct well-written pieces when he is given a creative assignment, however, he struggles to craft formal written pieces, especially on topics that are not of his interest.

Mathematics
J.N. receives [ICS] for math. Initially, J.N. has a difficult time understanding new concepts and applying previously taught

skills to those concepts, but once the concept is reviewed with him in either a small group or one-on-one, J.N. is able to grasp the concept with minimal teacher support.

J.N. struggles with homework completion.

Study Skills
J.N. is beginning to apply each executive functioning skill but struggles the most to maintain an organizational system and complete all work required for each class.

Counseling
J.N. has had his ups and downs throughout the school year, but overall, he seems to be doing really well. He can identify his feelings and with prompting, can come up with some strategies to help him cope. When J.N. expresses a negative emotion in our counseling sessions, he is able to identify coping skills. More of the struggle seems to be implementing these skills in the moment, when in the classroom. There are times throughout the day where he loses control and his emotions seem to take over and he has difficulty refocusing and deescalating. However, when calm, he can typically process his feelings. J.N. should continue to have support throughout his 7th grade year as we continue to build upon his awareness of his emotions and effective coping skills.

[Id. at 009–010.]

16.    The description of how J.N.'s disability, autism, affects his ability to handle the GE curriculum includes that J.N. has difficulty with, among other skills, reading comprehension, making inferences, recognizing an author's point of view, regulating appropriate responses and behaviors, self-monitoring, controlling impulses, remaining calm when frustrated or upset, and seeing another's point of view and how his behavior affects how others see him. (J-2 at 011.)

17.    The IEP includes the statements that J.N.'s "behavior impedes his learning or that of others. Appropriate strategies, including positive behavioral interventions and supports to address the student's behavior are included [herein]." (Id. at 011.) In the BIP, target behaviors include self-injurious behavior, non-compliance, physical aggression, verbal threats, cursing, verbal protest, elopement, and off-task. (Id. at

OAL DKT. NO. EDS 03372-22

013.)  The interventions to be used with J.N. and the conditions upon which they would be used are detailed and include, in pertinent part:

- Set clear expectations for behavior and clear earning descriptions.

- Prepare J.N. as much as possible as to what is coming next and what is expected behaviorally.

- Use "first/then" statement when working with J.N. on non-preferred and/or novel tasks/activities.

- Provide verbal warnings ten, five and two minutes prior to transitions.

- When J.N. engages in problem behavior, bring as little attention to it as possible.  Limit eye contact and verbalization.  Redirect by restating the demand and tell him what he should be doing.

- Make sure to gain follow through/compliance.

- J.N. should not be allowed to move on to the next activity without completing the demand at hand.

- When J.N. engages in problem behavior, use response blocking while bringing little to no attention to the behavior (i.e., minimal eye contact) and redirect J.N. to the demand at hand.

- As replacement skills and adaptive behaviors increase and problem behaviors decrease, the schedule of reinforcement should be faded systematically and continue to be increased to a level more similar to his peers.  The behavior plan should be generalized to all school staff and/or family and community members.

[Id. at 014.]

18.    No evidence was presented that J.N. was subject to discipline for his in-school behavior between September 2021 and December 9, 2021.  (See R-6 (HMS Disciplinary Record).)

19.    On December 9, 2021, J.N. was involved in a fight on the HMS playground, as a result of which he received a one-day in-school suspension.  (Ibid.)

20.     On December 16, 2021, J.N. was involved in an incident in the HMS auditorium, because of which he received an out-of-school suspension, which according to HMS records, was for ten days.  (R-6; R-7.)

21.     On January 11, 2021, the CST held a manifestation determination meeting (MDM) and concluded that J.N.'s behavior was a manifestation of his disability and changes to his BIP were recommended (but not described in the MDM report).  (R-7 at 83.)

22.     On January 11, 2022, one day after J.N. returned to school following his disciplinary suspension, and coincident with the MDM, the CST met to "assess progress and review or revise [the April 27, 2021 IEP."  (P-60.)  Both parties brought counsel to the meeting.

23.     The concerns of the parent as expressed and discussed at the IEP meeting were as follows, in pertinent part:

- The team presented the alternative school schedule to help [J.N.] adjust back to in-person full time at HMS [as] attend in-person at HMS for periods 1, 2, and 3, go home for lunch/recess and attend afternoon classes virtually.

- Parents agreed that [J.N.] can come home for Lunch/Recess [but] disagreed that [he] should continue to attend school virtually[.]  They want [J.N.] to return in person to HMS, access his classes virtually from an alternative setting from HMS, and have direct access to his 1:1 behavioral services in the afternoon.

- Dr. Henderson agreed that attending school virtually from home may not provide enough structure for [J.N.] [and] offered for [J.N.] to attend a day program that specializes in students with autism (Bancroft) for the afternoon where he can receive structure and behavioral services.   Parents disagreed[.]

- Parents . . . referred to the fact that a dedicated place in the building should be available for [J.N.].  Dedicated locations are identified for [J.N.] as part of his BIP [but] a dedicated place to attend school virtually is not part of his IEP.

- Board counsel stated that all parties agree a transition plan is necessary but that agreement was not reached as to what it should include.

- Mercado reviewed the changes in [J.N.'S] BIP, including the crises plan.

- M.L. wants all staff to be trained on the BIP and the team agreed to add this to the IEP.

- Parents raised additional concerns/questions and both counsel recognized that there may be some disagreement regarding details of the crises plan but that Mercado must be permitted to complete it for CST review.

- By email after the meeting, respondents made 21 additional requests for changes to the BIP, additional related services, increased BCBA services, two-to-one aides during transition period, autism and ABA training of all HMS staff, increased parent training, and compensatory education. Some, but not all, of the requested changes were accepted by the District. The District responded to all requests.

24.    No evidence was presented that J.N. was subject to discipline for his in-school behavior between January 10, 2022, and April 6, 2022, but five incidents were reported between April 6, 2022, and April 13, 2022.  R-6.

25.    On April 13, 2022, the CST met with respondents to present the IEP to be implemented from April 28, 2022, through the end of the school year, June 22, 2022.  In the April 13, 2022, IEP, the recommended placement is a private day school for students with disabilities.  (J-8.)

26.    In developing the April 13, 2022, IEP, the following evaluations and/or assessments of J.N. were considered, and are quoted below in pertinent part:

- 9/5/2020 Behavioral Observation (Described using the identical language found in the April 27, 2021, IEP.)

- 2/24/2020 Psychological Evaluation—J.N. is a ten-year-old fifth grader attending a small private school.

OAL DKT. NO. EDS 03372-22

J.N. overall demonstrated strong cognitive skills for his age.  This suggests that he has well developed cognitive abilities conducive for academic learning.  Some of his behavioral and emotional needs may have negatively influenced his performance on the working memory subtests and on the processing speed subtests.  When individuals are anxious or have strong emotions, working memory skills are often impacted.  J.N. tends to be impulsive, which may be the reason why he had errors on the processing speed subtests.  His emotional and behavioral needs continue to impact his educational functioning.

- 2/22/2020 Learning Evaluation Report—J.N. . . . initially presented as very verbal and cooperative.  As testing required J.N. to use a pencil in order to respond to written tasks. J.N. refused to comply with examiner requests.  Certain subtests could not be completed due to J.N.'s refusal[.]

  Based on the results of the standardized testing, J.N. performed within the globally High Average range for reading, Word Identification skills and Passage Comprehension.  Math Calculation fell in the low range due to his refusal to complete the task.  Applied Math problems were a strength for J.N. falling in the high average rank.

27.   The section titled "Strengths of the Student" contains input from four of J.N.'s teachers, dated from 2/2022 through 4/2022.  Their statements follow:

- J.N. is a bright, engaging, funny, and insightful student. He throughout [sic] enjoys science and finds math challenging but always tries his best.  He loves to show his knowledge through presenting and class discussions.  He is a pleasure to have in class.

- J.N. is bright, funny, knowledgeable, kind, and has a good sense of humor.  I have greatly enjoyed working with him.

- J.N. is an intelligent, friendly, and outgoing student who loves to interact with his peers and teachers.  He participates well in ELA and social studies and usually asks questions when he is unsure of something.  J.N.

OAL DKT. NO. EDS 03372-22

> does a great job of verbalizing his understanding of
> new material before writing it down, and he is improving
> his ability to revise his work before turning it in.  It has
> been a pleasure to have [J.N.] in ELA and social
> studies class this year, and I look forward to working
> with him through the remainder of the 2021–2022
> school year.

- [J.N.] is very engaging and has very thought provoking
  conversations.  He is funny and a pleasure to work
  with.

28.    The concerns of M.L.[10] were detailed in the IEP as follows, in pertinent part:

- Modify things for [J.N.] due to the behaviors.  . . . [M.L.]
  is not sure whether [J.N.] can tolerate a full day in
  school.  He is struggling in school and at home. . . .  He
  is not able to deescalate and return to a task (therapy
  or school).

- Mom would like him to finish 7th grade with his peers.
  We need to modify as much as possible by possibly
  shortening the school day, having shorter class time,
  and not forcing him to stay in class if he cannot handle
  it.

- [M.L.] does not want to set up situations where it can
  be an escalation between [J.N.] and [Tim Cass, J.N.'s
  registered behavioral technician (RBT)].  It is not worth
  having the escalation.

- If [J.N.] wants to walk out of the building, let him walk
  away.  Better than to escalate to a point where a hold
  is needed.

- In response to the presenting fact that J.N. is struggling
  with his ability to cope with attending the current school
  setting, and is not able to consistently attend and
  engage in the academic classes, Dr. Leren stated that
  the District is recommending an out-of-district
  placement for [J.N].  At this point, [J.N] needs a more
  structured clinical setting to address his emotional,
  social, and behavioral needs.  Emotionally, [J.N] is not
  capable at this moment to access the regular education

---

[10]  T.N. did not share any separate questions or concerns in advance of the IEP meeting.  (J-8 at 081.)

> curriculum despite his good academic skills and
> potential.

- [M.L.] shared that she disagrees with the out-of-district placement.  Instead she wants a partial hospitalization placement.  However, there is an 8-week waitlist.

- [M.L.] shared that they are looking into a lot of support for [J.N.] at this point outside of school.

- Dr. Henderson shared that the district will recommend an out-of-district placement for the remainder of the current school year and for the next school [sic] despite the parents' pursuit of additional support for [J.N.] outside of school.

- [M.L.] asked which schools the district is recommending [and] shared that she disagrees with Garfield Park Academy's recommendation [because] she believes the school has poorly trained staff; [J.N.] will be placed in physical holds frequently; he will not receive exposure to a good academic curriculum.

- Dr. Henderson . . . disagreed [and] [M.L.] stated that we have to agree to disagree on this point.  [M.L.] asked that it will be documented that the parents are requesting that the district provide [J.N.] with additional behavioral support and a modified schedule to meet his needs.

   [J-8 at 081–82.]

29.   The District applied for emergent relief on April 27, 2022.  J.N. has not returned to HMS and the April 13, 2022, IEP was not implemented.

**Testimony**

Petitioner presented five witnesses; respondents presented four witnesses,[11] including M.L. on behalf of herself and J.N.'s father.

---

[11] On March 24, 2023, counsel for respondents asked me to conduct the examination of J.N. and that J.N. not be subjected to examination (direct or cross) by counsel of either party.  Counsel for the Board objected to examination of J.N. without cross-examination as a denial of due process which would result in prejudice to the Board.  By letter order dated April 12, 2023, I ruled that testimony of J.N. (should he be called) would

OAL DKT. NO. EDS 03372-22

**Tracy Ann Matozzo** (Matozzo) testified for petitioner, her former employer. Matozzo was hired by respondent in June 2012 as dean of students and promoted to principle of HMS in June 2017, a position she held for five years.  Her last day as HMS principal was June 23, 2022.

HMS has an enrollment of 600–700 students in sixth through eighth grades.  The class day is made up of eight periods of forty-eight minutes each; lunch and recess together are one period.  Students stay in their homerooms for the first class and then rotate seven times between classes.  Matozzo described additional transitions as changing clothes before and after gym class, with the potential of fire alarms and active-shooter drills.  From time-to-time pep rallies, demonstrations, and celebrations are held during the school day and all students attend.

Matozzo knows J.N. from his time enrolled at HMS.  She stated that he had an IEP during the 2020–2021 and 2021–2022 school years and in both was placed in a GE classroom with an ICS instructor.  While she was not involved in placement decisions for SE students, Matozzo knows that HMS did not offer self-contained classrooms and, therefore, that option was not considered for J.N.

Matozzo identified her certification, dated April 25, 2022, in which she described incidents involving J.N. during the 2021–2022 school year.  (J-10.)  In all these incidents, J.N. was having difficulty managing his emotions, response, and/or behavior to a person or situation, resulting in J.N. crying, yelling, and/or cursing, behaving in a physically aggressive manner, and/or eloping.  Generally, Matozzo said her job was to de-escalate (or assist with de-escalating) J.N., to restore order, and, as necessary, to remove other students from the vicinity.  She would speak to J.N. without cursing, remind him of positive outcomes, and, if necessary, call his parents.

Matozzo described specific incidents in which she was called because J.N.'s behavior was escalating.  She observed him crying, standing in the hall apart from the class, sitting on the floor, and yelling profanities.  Such incidents lasted from ten minutes

---

be conducted in the presence of opposing counsel and J.N. would be subject to cross-examination, strictly limited to matters raised on direct examination.  J.N. was not called.

to as long as forty-five minutes.  On December 16, 2021, Matozzo was called to the auditorium (during lunch), where she observed J.N. sweating, red-faced, crawling on the ground, attempting to grab furniture, and calling for his mother.[12]  She directed the removal of other students from the room, describing them as "upset" and moving out of the room "quickly."  After this incident, five female students requested counseling, concerned that J.N. could or would hurt them.  (Tr. of March 22, 2023 [T-1] at 39)

The December 16, 2021, incident was captured by the HMS security camera in the auditorium.  Matozzo watched the tape of the incident with Dr. Carmen Henderson, Dr. Kristen Leren, Melanie Conklin, GE teacher Jonathan Maxson, J.N.'s parents, J.N.'s treating psychiatrist, and BCBA George Mercado.  Based on that meeting, Matozzo stated that M.L. and T.N. disagreed with the school's characterization of the incident.

As a result of the December 16, 2021, incident, J.N. was, consistent with the HMS Student Code of Conduct, suspended for ten school days for assault.  Matozzo recalls discussing the suspension and potential alternate placements for J.N. with Dr. Henderson, Dr. Gino Priolo, the assistant superintendent, and Mr. Chuck Klaus, the superintendent.  It was Matozzo's understanding that her colleagues were communicating with J.N.'s parents about alternate placements.

Matozzo stated that she did not place any condition on J.N.'s return to school and recalled that he did not return immediately following winter break, though she did not recall why.  Matozzo also recalled calling J.N.'s home when he did not return, and speaking with her supervisors, who told her they were discussing alternate placements for J.N. with his parents.  She stated that she did not bar the school door or refuse J.N. entry on January 2, 2022.

Matozzo stated that she was called to the bathroom on two occasions because J.N. would not come out.  J.N. told Matozzo that he did not like other students in his social

---

[12] In her certification, Matozzo stated that "J.N. slapped a classmate."  (J-10, ¶ 4.)  However, at the hearing, she stated that she arrived after the initial encounter between J.N. and the other student.  Review of the video shows J.N. turning toward a classmate sitting behind him and waving his arm and hand toward the student, as if to swat him, but not actually touching him.

studies class and left his class to "get the f___ away from them; he f___-ing hated them and didn't want them f___-ing near" him.  (T-1 at 44.)

Matozzo described two incidents in J.N.'s math class.  The first time, J.N. sat in the corner and would not leave.  Matozzo, the math teacher, and J.N.'s one-to-one aide tried to convince J.N. to leave the room; other students were directed to the library.  In the second incident, J.N. ripped up an assignment and walked out the door, cursing.  The ICS teacher assigned to J.N. emailed Matozzo that she felt threatened by J.N. during this incident.

HMS has a counselor's lounge, also called a "safety room" and/or a "decompression room," where students can go for counseling or to feel safe.  Matozzo stated that J.N. had a "counseling mandate," meaning that he could seek out the school counselor when needed.  In the spring of 2022, Matozzo was called to the counselor's lounge because J.N. had shut himself in the counselor's office and was making loud, banging noises.  Other students in the lounge area told the counselor that J.N. made them feel unsafe.  (T-1 at 53-54.)

J.N. lives close enough to HMS that he can walk home.  Matozzo has seen him leaving school on his own and has heard him threaten to leave on his own.  Matozzo walked J.N. home twice because she didn't want him walking alone; he told her he was angry and did not like school.  Matozzo stated that during the 2021–2022 school year, J.N. frequently left the school building early or left class to see the counselor, thereby missing academic instruction.

Matozzo identified an email sent to her on March 30, 2022, by M.L., in which M.L. stated:

> [T.N.] did speak to [the psychiatrist] last week after we spent 8 hours in the [Children's Hospital of Philadelphia emergency room] attempting to get [J.N.] admitted (after he became physically aggressive toward me, and was engaging in [self-injurious behavior]).

> My left arm is badly bruised in 2 different areas—he punched
> me approximately 7 times before I was able to safely get
> away.
>
> [P-13.]

Matozzo identified J.N.'s disciplinary record for the 2021–2022 school year. (R-6.) Three incidents resulting in discipline took place on April 8, 2022; Matozzo did not recall any discussion regarding modification of J.N.'s BIP because of these incidents. Matozzo has no personal knowledge of the April 13, 2022, incident, which took place in the classroom. She has no recollection of anyone saying that J.N.'s BIP was implemented during that incident. According to his record, J.N. received a one-day in-school suspension for the April 13, 2022, incident; Matozzo has no recollection of this decision, but would have cleared it with her superiors. She could not recall discussions regarding amending J.N.'s IEP at this time and did not discuss modifying his BIP with the BCBAs.

Based on the information known to her, it is Matozzo's professional opinion that J.N. struggles in GE settings and would be better able to reach his education in a more supported setting.[13]

**Dr. Sarah Woldoff** testified for petitioner. She identified her curriculum vitae, which summarizes her education, professional experience, areas of specialization, certifications, and professional presentations. (P-52.) Dr. Woldoff was offered and qualified as an expert in autism, program design, applied behavioral analysis (ABA), and neuropsychology.

Dr. Woldoff identified the report she prepared. (P-53.) She was retained by petitioner to give her opinion on the appropriate placement for J.N.; she reviewed J.N.'s records,[14] beginning with the October 5, 2013, occupational therapy evaluation, and

---

[13] Respondents objected to Matozzo as a fact witness offering her professional opinion. N.J.A.C. 1:1-15.9(a)(1), (2), permits a witness not testifying as an expert to give an opinion if the judge finds that her opinion is "rationally based on the perception of the witness [and is] helpful to a clear understanding of . . . the fact in issue." With such findings being made, Matozzo's opinion was accepted.

[14] Respondents objected at the hearing and in a written motion dated March 30, 2023, to Dr. Woldoff's use of J.N.'s confidential student records without explicit permission from his parents. An order was issued on April 17, 2023, denying the motion to exclude her testimony.

observed program options at HMS during the 2022–2023 school year.  She stated that typically, if conducting an assessment, she would meet with the student, conduct testing, and observe the student in the classroom.  Here, though, her assignment was to conduct a record review, not to issue a diagnosis, and she was not given access to J.N., his parents, his teachers, and/or the BCBA.  Further, she had access to emails and texts from the parents; the IEPs, which included parent concerns; and the FBA recently obtained by the parents, which included a summary of parent interviews.  She concluded that she had sufficient information to give her opinion.

Generally, Dr. Woldoff described J.N.'s behavior as indicative of autism and of DMDD, which is marked by "chronic irritability, trouble functioning, peer interactions, hostility, [and] aggression against any authority."  (T-1 at 138.)  She concluded that J.N. requires a level of service that cannot be provided in the District.  He requires clinical and behavioral support not found in a traditional middle-school environment, including "24/7 access to counseling," family therapy, and cognitive behavioral therapy.  He would be taught in a 1:1 setting, one teacher to one student, with the addition of a BCBA and a therapist in the classroom.  Dr. Woldoff recommends the use of "extinction techniques" to work through J.N.'s "physical [and] verbal aggression, rapidly escalating and unpredictable behaviors, his difficulties being de-escalated, and the severity of his behaviors."  (P-53 at 4.)

Dr. Woldoff explained "extinction therapy"[15] as giving no response to verbal and/or physical aggression.  Because the child is used to getting verbal attention for the behavior (e.g., verbal redirection), the aggressive behavior will increase in intensity and frequency, reaching a crescendo.  "Behavior that was occurring fifteen times . . . might shoot all the way up to fifty times, maybe even sixty times," and will remain high for a while before it eventually comes down.  (T-1 at 135.)  For J.N. specifically:

> [H]e has some aggressive behavior that includes disruption, verbal aggression, physical aggression, elopement.  You can see all of these things increase to where his behaviors are even more intense [until he] skips right to aggression[.]  He's

---

[15] "Extinction therapy" is generally defined as an ABA technique in which problem behavior is ignored and, gradually, the absence of positive reinforcement (attention) results in the elimination of the behavior.

throwing furniture, he's breaking things, so it could be where it's dangerous.

[T-1 at 136.]

The environment where such therapy can be used must be adapted to ensure the child's safety, and that of teachers, aides, and other students. Woldoff recommended a one-to-one aide for J.N. in a restricted room with minimal items and people. Even if no one pays attention to the disruptive behavior, moving staff and students out of the area is a form of attention or response.

Dr. Woldoff agreed that all testing conducted to date shows J.N. as "high-functioning," but stated that he is not available for academic instruction due to his behavioral challenges. She concluded, in pertinent part:

> Maintaining [J.N.] in [HMS] is dangerous, given his physical aggression, verbal aggression, rapidly escalating and unpredictable behaviors, his difficulties being de-escalated, and the severity of his behaviors, which pose a safety risk to his well-being and other students within the school setting.

[P-53.]

Dr. Woldoff agrees with petitioner that both Garfield and Hampton are appropriate placements for J.N. because they offer intensive therapy, a social worker in every classroom (for crisis intervention), parent therapy, and an integrated approach to care, and they would set goals to address J.N.'s overall functioning. She does not recommend an ABA-based program for J.N.; neither Garfield nor Hampton uses only ABA.

Dr. Woldoff was surprised to learn that J.N.'s last full FBA was conducted in 2018 and has not been updated despite behavioral incidents. She did not review records of the implementation of J.N.'s BIP, nor did her report address the failure of the CST to modify his IEP between the start of school in September 2021 and April 13, 2022.

Dr. Woldoff appeared to agree that if J.N.'s placement was changed from ICS in a GE environment to a self-contained autism class he could remain in the District (though

here, too, technical problems resulted in holes in the transcript).  She also agreed that such a placement would remove most transitions from his school day.  Dr. Woldoff cited two problems with placing J.N. in a self-contained classroom.  First, his cognitive skills are well beyond that of other students in that setting,[16] and second, behavioral management would be challenging in a setting where other disabled children could be at risk, and/or would have to be removed, because of J.N.'s aggressive behavior.  Overall, she believes that HMS is not able to provide the intense level of therapeutic support needed by J.N.

**George Mercado** (Mercado) testified for petitioner.  He has been employed by BDA for approximately three years as a BCBA, during which BDA had a service contract with the District.

Mercado described a BCBA as an "individual that observes the behaviors in the environment and the variables that are involved in those behaviors" and works with the client to modify negative behaviors and/or to develop skill sets to deal with variables in the environment.  (Tr. of March 23, 2023 [T-2] at 25–26.)

Mercado knows J.N. from serving as his BCBA during his sixth- and seventh-grade years at HMS.  During the 2021–2022 school year, Mercado was at HMS on average three days per week.  He identified the IEP for the 2021–2022 school year, dated April 27, 2021.  (R-1.)  Mercado did not have specific knowledge of whether the BIP in this IEP was modified during the 2021–2022 school year.  He would have, during the year, reviewed the collected behavioral data and made recommendations to the CST (including the parents) if changes needed to be made to the BIP.  Mercado stated that J.N. had made progress on his BIP and, when it was not working, changes were made to "the schedule of reinforcement, identifying different reinforcers that might be more motivating[.]"  (T-2 at 110.)

In the April 27, 2021 IEP, J.N. is to be given transition warnings.  (J-2/R-2 at 14.)  Rather than preventing J.N. from changing classes with his peers (a transition), his aide

---

[16]  There was undisputed testimony describing J.N. as "gifted" academically.  Dr. Woldoff did not research the academic profiles of other students in the HMS self-contained classroom.

OAL DKT. NO. EDS 03372-22

would give him a transition warning and permit him to choose to walk in the hall with his peers, a behavior that the CST was trying to reinforce.  J.N. also had difficulty during the school day when demands were placed on him (such as to complete a task), when attention was not being paid to him, and when he was denied access to tangibles (any item).

Between January and April 2022, Mercado communicated with respondents regarding J.N.'s behavior.  He identified a series of texts dated March 23–30, 2022, between himself, respondents, and Tim Cass, J.N.'s behavioral assistant (or one-to-one aide)[17] at HMS.  (P-4.)  In the texts, M.L. describes a physical altercation between herself and J.N. in which J.N. "punched [his mother] seven to eight times as hard as he possibly could," and that he would be going to Children's Hospital of Philadelphia (CHOP).  Based on those messages, Mercado felt that J.N. presented a danger to others (and noted that J.N. had attacked him as well).  (T-2 at 39.)

Mercado recalled discussing J.N.'s behavior at home with his parents and how to reinforce positive behavior both at home and in school, "to provide motivation for [J.N.] to engage in preferred behaviors in both settings."  (T-2 at 41.)  He agreed, however, that while parent training was done in the home while J.N. was in ESY, there was no provision for such training during the school year.  (R-1 at 21.)

In or about November 2021, Mercado spoke with M.L. regarding alternative placements for J.N. due to M.L.'s concerns about his behavior in the home, her own safety and that of her daughter, and the need to get J.N. the help he needed.  Mercado identified an email from M.L. dated November 24, 2021, in which M.L. reported that she was not able to place J.N. at KidsPeace.  (P-6; P-7.)  He identified an email dated March 30, 2022, from the parents describing self-injurious behaviors in which J.N. engaged.  (P-13.)

To Mercado's knowledge, J.N. was restrained physically one time during the 2021–2022 school year, by Pennington on December 16, 2021.  Mercado stated that Pennington was a substitute and was also employed by BDA.  Mercado explained the

---

[17]  Mercado stated that three other behavioral assistants worked with J.N. that year, each for a very short time, but could only recall the name of Sedale Pennington.

BIP in J.N.'s IEP to Pennington; discussed interventions, strategies, and target behaviors; and went over J.N.'s schedule.  He spoke to Pennington every day that he worked with J.N. and answered questions about the implementation of the BIP.

Mercado knows that J.N. was suspended from school as a result of the December 16, 2021, incident, participated in the January 11, 2022, MDM, and recalled that the CST asked for clearance from J.N.'s psychiatrist before he returned to school.  He identified the January 20, 2022, letter from Dr. Marko Mircetic, J.N.'s psychiatrist (J-12), and recalled discussing it with the CST.  An FBA was not conducted after J.N. returned to school.  Mercado recalled many meetings with respondents and the CST members between January and April 2022, but could not recall dates and does not know if the IEP was amended as a result.  He did not know that an FBA was required after J.N. was removed from school for a disciplinary infraction that was a manifestation of his disability.

In February 2022, Mercado trained staff at HMS, including SE and GE teachers, CST, and administrators, on J.N.'s BIP, and discussed "target behaviors, intercede interventions, consequence-based interventions, reinforcement system [and] crisis plan." (T-2 at 142.)

Mercado identified behavioral incident reports dated April 6, 8 and 13, 2022, regarding J.N. and stated that each is accurate.  (J-4; J-5; J-6.)  Based on these incidents, Mercado stated that J.N. could pose a threat because "he would engage in aggressive behaviors toward himself and others that made the environment unsafe and unpredictable."  (T-2 at 65.)  J.N. specifically punched, kicked, and used windmill punches on Mercado.  He observed J.N. attempting to punch, slap, grab, and kick Cass.  Between classes J.N. "would attempt to steamroll through kids in the hallways and . . . pushing against them and out of his way."  (T-2 at 67.)

As was noted when J.N. was in the courtroom, he is a large boy, and Mercado confirmed that J.N. was essentially the same size during the 2021–2022 school year. Mercado stated that J.N.'s size factors into him posing a danger to others because "he uses his body to his advantage when he's going through an episode," pushing people out of the way and/or overpowering them.  (T-2 at 74.)

HMS has a self-contained classroom, but Mercado did not recommend that J.N. be placed there rather than GE with ICS.  Students in the self-contained class still transition from the classroom to electives, lunch, and recess.  Mercado does not know the number of students that were in each class, other than that there were fewer children in the self-contained classroom.

**Tim Cass** (Cass) testified for petitioner.  He has been employed at BDA for approximately seven years, currently as an operational behavior consultant manager.

Cass knows J.N. through his work with BDA at HMS.  During the 2021–2022 school year, Cass was with J.N. throughout the entire school day "to help him with any" educational or behavioral needs.  (T-2 at 150.)  During this year, Cass communicated with respondents most school mornings by text, phone, and/or in-person to confirm J.N.'s arrival time, absences, and the reasons for late arrival and/or absence.  Often the reason for delays or absences was physical aggression toward his parents or sister "or noncompliance [with] the demands that were placed" on him as he prepared to go to school.  (T-2 at 152.)

Multiple times during the 2021–2022 school year Cass walked J.N. home from school before dismissal.  J.N. would elope close to the end of the day, and for Cass to stop him would have resulted in "a big physical outburst" in front of other students.  After consulting with Mercado, they decided it was safer and better for J.N. for them to simply follow him home to ensure he got there safely.  There were also times when respondents asked Cass to bring J.N. home; to do so, he would check with authorities at HMS and with Mercado.

Cass and Mercado communicated by text, phone, and in-person regarding J.N. Topics of discussion included:

> training, updating the [BIP], how [Cass] dealt with certain behaviors, what modifications [Cass] made to [make the BIP] fit the needs of the space they were in.
>
> . . . .

> If we were in class and J.N. [was engaged in targeted behavior] and the class was filled with students how would I deal with that behavior in the moment knowing that the behavior might escalate to something more physical and that might put other children, other staff or myself in danger.
>
> [T-2 at 156.]

To address negative physical behaviors, Cass employed blocking and redirecting physically (such as turning J.N. away from danger).  He did not physically restrain J.N. He did not initially recall if, during the 2021–2022 school year, J.N.'s BIP was changed, but then agreed that it would have been his responsibility to know if changes were made and the BIP was modified.  He collected data on J.N.'s various target behaviors, but after submitting such data to Mercado, does not know what comes of the data.

In the fall of 2021, Cass recalled speaking with respondents and Mercado about placing J.N. in an out-of-district residential program to address his behavior.  Cass identified screenshots of texts dated March 27, 2022, from M.L. describing an incident in which J.N. attacked her.  (P-4.)  Cass also recalled conversations with respondents around the same time in which respondents described violent behavior toward M.L. and her daughter.

Opposing counsel asked Cass about an incident on or about December 9, 2021, on the HMS playground in which other HMS students used their cell-phone cameras to film J.N. being assaulted.  In response, Cass recalled an incident on the HMS playground in which J.N. "and another student go into a fight."  (T-2 at 187.)  Cass stated that he was on the playground and that he broke up the fight, and he is shown on the student video breaking up the fight.

Cass identified the April 6, 2022, Behavioral Incident Form, which he authored.  (J-4.)  Cass recalled that J.N. made an inappropriate comment to a classmate in the hall; when Cass attempted to redirect J.N., "it turned into property destruction and then elopement" onto the street.  (T-2 at 163.)  J.N. called Cass a "black mother f____er."  (Id. at 165.)  Cass attempted to de-escalate J.N.; he had to walk past "cool-down" rooms as he left the building and Cass offered for him to use them.  Cass gave J.N. access to his

cell phone so he could (and did) call a parent.  Once he left the building, Cass offered for J.N. to stay outside and calm down before returning.

Cass identified the April 8, 2022, Behavioral Incident Form, which he authored.  (J-5.)  Cass recalled that J.N. was in study hall and wanted to use his cell phone, although he had not completed his work.  J.N. threatened Cass with a stapler, stated that he wanted to leave, and called his father.  To de-escalate, Cass reduced the amount of work J.N. would have to complete to earn free time; he offered the cool-down room, and for J.N. to talk to his parents.  When T.N. arrived, J.N. left school early with him.

Cass identified the April 13, 2022, Behavioral Incident Form, which he authored.  (J-6.)  Cass recalled that J.N. had been absent for a few days and, during the first period of his first day back, the teacher helped J.N. with an assignment he had missed.  J.N. did not want to complete the assignment, and so ripped it.  When the class was over and the other students had left, J.N. was upset and threw his paper at the teacher.  He then picked it up, ripped it and threw it on the floor.  J.N. proceeded to swing at and kick Cass; Cass stepped on J.N.'s toe that had been previously injured, and the sore opened.[18]  The situation escalated, Mercado was called, and eventually J.N. left for the day.

Cass described the de-escalation techniques he used—breaking a large task into smaller pieces, first-then strategy, use of the quiet room—but nothing worked.  Cass knew that shortly after this incident an out-of-district placement was proposed for J.N.  Cass believes that placement is appropriate for J.N. because he would benefit from a smaller classroom, out of consideration for the safety of the children around him, and because he needs an environment where his physical aggression can be addressed.  Cass was part of J.N.'s CST but had no recollection of whether he recommended moving J.N. to a self-contained class during the 2021–2022 school year.

**Dr. Carmen Henderson** testified for the petitioner.  She is completing her third year as the District's Director of Special Education.  In this position, in addition to her SE

---

[18] On cross-examination, Cass stated that he did not step on J.N.'s foot, rather his foot "grazed" J.N.'s foot.  (T-2 at 186.)  The HMS nurse went to the main office and examined J.N.'s foot but she did not take him to her office.

responsibilities, she coordinates Section 504 accommodations, supervises the District's inclusive preschool program, and oversees the District's goal on cultural responsiveness. Dr. Henderson identified her curriculum vitae, which summarizes her educational and professional experience, and her certifications, stating that both are accurate.  (J-1; P-3.)

Dr. Henderson knows J.N. from her involvement in his case.  She identified the April 13, 2022, IEP drafted for J.N.  (J-8.)  She attended the CST meeting to discuss his current programming and to review the District's recommendation for a change in his placement to Garfield or Hampton for the following reasons:

> [J.N.] had displayed a [sic] escalation in behaviors throughout the school year [that] were aggressive in nature towards staff and students.[19]
>
> His behaviors were also noncompliant and so the team felt that an out-of-district placement would be more appropriate to provide [J.N.] with a FAPE.
>
> [T-2 at 209:5–10.]

Both the recommended placements specialize in students with emotional dysregulation and/or mental-health disorders and provide structure necessary for students whose behavior is disruptive to their education.  Dr. Henderson identified promotional literature for both schools which she took from the schools' websites and provided to the CST.  (P-11; P-12.)[20]

Dr. Henderson stated that respondents objected to the proposed placements; M.L. stated that both schools used physical restraints with students and that she had experience with clients who attended those schools.  Further, M.L. stated that she

---

[19]  Counsel objected to Dr. Henderson's description of J.N.'s behavior as being based on hearsay, but she witnessed his aggression and use of profane and aggressive language firsthand and, therefore, her testimony was accepted.

[20]  Counsel objected to these documents, stating that Dr. Henderson could "pull anything off the internet," even though earlier in these proceedings his clients submitted articles about incidents occurring at both schools that they obtained from internet.  (See T-2 at 218.)

"doesn't work all the jobs that she does for her child to go to school in Camden or Atlantic City."[21]  (T-2 at 219.)

Dr. Henderson identified the text messages regarding J.N.'s physical aggression toward his mother.  (P-4.)  She had spoken with M.L. prior to seeing these texts, and M.L. told Dr. Henderson that J.N. had punched her, she had to lock herself in the bedroom, and she wanted him to stay with his father "because she did not feel safe."  (T-2 at 220.) Dr. Henderson had no further discussions with respondents regarding J.N.'s physical aggression; she only knew that respondents were considering a residential program for J.N. due to discussions with other members of the CST.  (P-6; P-7.)

Dr. Henderson gave two reasons for the recommendation to move J.N. from an in-district GE class with ICS to an out-of-district placement:  First, the escalation in his behavior was extreme, HMS had attempted to "get [J.N.] to spaces that would allow him to continue his day, but it was difficult" to do so, and as a result he was not receiving FAPE at HMS.  His behavior was unpredictable; physical aggression could lead to him leaving the school building, which was not safe for him.  Verbal and/or physical outbursts could result in the need for the other GE students to evacuate the classroom, which reduced their learning.

Second, the middle ground, a self-contained classroom at HMS, was not appropriate for J.N.  The other students were multiply disabled with "significant cognitive impairment" and J.N. has no cognitive impairment.  (T-2 at 223–24.)  Dr. Henderson was not surprised that J.N. received mostly A's and B's during the 2022–2023 school year, because he is extremely bright.  Significantly, Dr. Henderson stated that the District has no students like J.N. at HMS or the high school, and HHS does not have an emotionally disturbed class.

According to Dr. Henderson, the District tried to work with the parents, using the recommendations of behavioral staff, increasing behavioral support, making

---

[21]  Dr. Henderson clarified that the schools are located in Willingboro and Westhampton, not Camden or Atlantic City.

modifications to J.N.'s schedule, and calling the parents when J.N.'s behavior was escalating and/or he was threatening to leave the building.

On cross-examination, Dr. Henderson was asked about L.T., a severely disabled four-year-old child who was placed by the CST into a Head Start program.  (RX-1.)[22]  Dr. Henderson was the case manager (at a school where she was previously employed). When asked if this placement was appropriate under the IDEA, she explained that L.T. was given a one-to-one aide, an occupational therapist, a physical therapist, and an SE teacher in a multiple-disabilities program that Dr. Henderson developed for L.T. (though all of the above is not reflected in the IEP).

Dr. Henderson recalled that J.N. was given a suspension from school in December 2021;[23] she stated that a "clearance letter" from his psychiatrist was not required, only a verbal statement was required.  The last day of his suspension was January 7, 2022, his MDM was January 11, 2022, and it was determined that the behavior that resulted in his suspension was a manifestation of his disability.  (R-7.)  Dr. Henderson stated that an FBA was not conducted because a behavioral observation was performed (earlier in the year) and the behaviorist said that the functions of behavior did not change.  The CST team, however, held an IEP meeting on January 11, 2022, to make changes to J.N.'s BIP. J.N.'s IEP was not changed (at any time during the 2021–2022 school year) to prevent him being in the hallway during transitions with other students even though he acted inappropriately, because he "often had inappropriate behaviors throughout the day whether he was walking in the hallways or being in the class."  (T-2 at 265.)

After J.N. was removed from school in April, the CST held an MDM on May 6, 2022, and it was determined that his behavior was a manifestation of his disability.  (R-4.) An FBA was not conducted but was recommended to be conducted when J.N. arrived at his new placement.

---

[22]  Petitioner objected to this evidence as not being disclosed five days prior to the hearing.  The evidence was admitted for impeachment purposes, but given Dr. Henderson's explanation of the underlying case, it had little effect on her credibility.

[23]  Dr. Henderson insisted that the discipline record was incorrect and that J.N. was only suspended for eight days.  On December 17, 2021, HMS was closed to students; some days on the list were half days.

**Alexis Strobe** (Strobe) testified for respondents.  Strobe is employed by Behavior Interventions, Inc., where she works as a senior BCBA and assistant supervisor.  She identified her curriculum vitae, which summarizes her educational and professional experience.  (R-23.)  Strobe was offered as an expert in ABA with the SE population.  Consistent with petitioner's objection, while Strobe's expertise in her field was noted, she did not prepare and/or submit an expert report and was, therefore, not qualified as an expert.[24]

Strobe stated that she began working with J.N. in the summer of 2020 or 2021,[25] after being referred to his case based on proximity to his home and her expertise with his age group.  Strobe works with J.N., providing ABA services, once each week for two hours.  A registered behavior technician (RBT), Rebecca Smith (Smith), also of Behavior Interventions, was already working with J.N. when Strobe started.  Smith accompanies Strobe for her sessions with J.N. and has her own, separate, once weekly, two-hour session with J.N.

Strobe started using the BIP that had been developed by the prior BCBA, and then developed her own plan based on her assessment of J.N.'s current needs.  Target behaviors were aggression toward others, refusal behaviors, and inappropriate verbal behaviors.  Based on J.N.'s progress, Strobe updates his behavior plan every three months.

In the time Strobe has worked with him, J.N. has improved in tolerating adult-directed demands from ABA staff and his parents (to the extent Strobe has been present); putting himself in a "safe space" when he begins to respond emotionally; and accepting adult-directed demands when neither she nor the RBT is present.  Targeted behaviors—including aggression and refusal—have decreased, and skills—completing tasks by himself, accepting adult demands—have increased.

---

[24]  As were other fact witnesses, Strobe was permitted to give her opinion based on the facts known to her as a result of her experience working with J.N., pursuant to N.J.A.C. 1:1-15.9(a).

[25]  On cross-examination, Strobe was asked if she began with J.N. in the summer of 2022, but Strobe insisted she could not recall.  (See Tr. of March 24, 2023 [T-3] at 35.)

Strobe described a typical session with J.N. as (1) parent discussion of J.N.'s progress, schedule for the week, concerning behaviors, eating and sleeping habits; (2) J.N. chooses a goal for the day, with help from ABA staff and his parents; (3) use of strategies to have J.N. use the behaviors needed to accomplish his goal; and (4) collect and record data.   The RBT implements the behavior plan with J.N. while Strobe supervises.

Approximately one session each month includes parent training.   That involves discussions on difficult topics with Strobe mediating, practice of strategies such as extinction and/or redirection, and feedback on the parents' use of strategies.   Strobe keeps only anecdotal summaries of the parents' progress.

Most sessions take place in the home, but approximately fifty times Strobe and Smith have taken J.N. outside the home, where they have less control over the environment and the stimuli J.N. encounters, such as at a gym.   While she stated that the behavior plans are intended to "generalize beyond" the home and community settings, they are written for behaviors targeted in the home and community, not the school.   Strobe has never seen J.N. harm himself or others.

Strobe has not attended J.N.'s IEP meetings, provided input on his BIP, and/or conferred with anyone from the District regarding his removal from school.   She provides J.N.'s behavior plans and the data that is collected pursuant to the behavior plans to the parents and does not know if they have ever shared this information with the District.   She did not know that respondents refused the District's request to communicate with Strobe. She did not know if the parents asked her to attend an IEP meeting or whether she asked respondents if she could attend an IEP meeting.   While she had a vague recollection of asking Matozzo to observe J.N. in class, she could not recall Matozzo's response, but did go to J.N.'s class to observe him.

Strobe was asked on cross-examination about her knowledge of the incident in which J.N. hit his mother on the arm seven or eight times, of J.N. assaulting his sister, and of M.L.'s attempt to enroll J.N. at KidsPeace.   She could not recall "specifics" about

any of these incidents.  Strobe stated that she can only speak to J.N.'s behavior when she was present.

When asked to explain extinction, Strobe stated in pertinent part:

> Extinction is . . . not providing the reinforcer based off of behaviors that are targeted.  [B]efore any behavior treatments begin, there is a functional behavior analysis completed [to] determine function or reasons for that behavior to occur. During extinction or partial extinction, we want to delay the occurrence of the behavior targeted for reduction[.]
>
> For example, if a client engaged in head banging [to get] attention, then we would put in place a procedure of partial extinction to keep that client safe from head banging while reducing . . . attention to that client[.]
>
> [T-3 at 54.]

**Rebecca Smith** (Smith) testified for respondents.  Smith has been an RBT with Behavior Interventions, Inc., since 2019.  She identified her curriculum vitae, which summarizes her education and professional experience, including her current work with SE students in their homes.  (R-22.)  Like Strobe, Smith was offered but not qualified as an expert in ABA as applied to children with autism.

Smith began working with J.N. in August 2020 and she recalled Strobe beginning with J.N. in October 2021.  Sessions take place in the home and in the community but not in any sort of school setting.   On cross-examination, Smith could not recall when community settings were used.

J.N. has made progress in demonstrating anger appropriately, accepting boundaries, and using appropriate language, and has reduced refusal behavior.  To reinforce good behavior, Smith will use praise, permit J.N. to choose topics for discussion, "go to the coffee shop to get coffee."  (T-2 at 67.)

Smith could not recall seeing J.N. use self-injurious behavior, but he was physically aggressive with her, pushing her out of the way as he passed.  She could not recall her

OAL DKT. NO. EDS 03372-22

response (or what the behavior plan required by way of response) and stated that this behavior had not happened in the past year.  She knew that J.N. had punched his mother, but could not recall the date, though she admitted that it was important information for her to know.  She also knew that J.N. had, during the past year, been aggressive with adults at HMS, but this aggression had not shown up during her sessions with J.N.

Smith has not spoken with HMS about J.N. nor has she spent time with respondents training them to implement J.N.'s behavior plan (as that is done by Strobe). She knows that respondents have access to the data she collects on J.N.'s progress but does not know whether this data has been shared with the District.  She has not been asked by respondents to communicate with the District or to sign a consent form to communicate with the District.  She has not observed J.N. in school or attended his IEP meetings.

Smith did not recall that M.L. attempted to gain entrance for J.N. in a residential facility.

**Dr. Christen Russell** (Dr. Russell) testified for respondents.[26]  She identified her resume, and summarized her educational and professional experience, as detailed in her resume.  (R-20.)  She was offered and qualified as an expert in ABA as applied to disabled children.

Dr. Russell identified her report, dated June 15, 2022 (R-19), and her addendum report, dated January 24, 2023 (R-24).  Petitioner objected to both on the grounds that they are based upon data and information collected after April 13, 2022, the date of the disputed IEP.  Both reports were admitted despite the objection as they were based on much of the same material used by the CST when they recommended a change in J.N.'s placement and by petitioner's expert in her record review.

Dr. Russell stated that she was retained to consider whether J.N.'s program and placement at HMS was appropriate and would promote learning given the behaviors in

---

[26]  Here, it is necessary to summarize Dr. Russell's report, as technical problems with the Zoom audio quality made much of the transcript of Dr. Russell's direct examination useless.

which J.N. was engaging.  Her review included an observation of J.N. in his mother's home, but not in any school setting or a setting with significant stimuli and/or noise.

To conduct her assessment, Dr. Russell reviewed J.N.'s educational file; interviewed M.L. and J.N., and Strobe; observed J.N. with Strobe on two occasions; and reviewed the data-collection forms completed by Strobe.  (R-19 at 187.)  In preparing her addendum report, Dr. Russell reviewed J.N.'s updated file and interviewed M.L. and J.N., three home academic instructors, Smith, and his new BCBA, Jacob Ahlstrand.

Dr. Russell summarized the information she obtained in her interviews, much of which replicates matters discussed above.  Noteworthy is M.L.'s statement that the male classmate who hit J.N. from behind on the HMS playground on December 9, 2021, is the same classmate who prompted J.N. to react aggressively in the HMS auditorium on December 16, 2021.  M.L. stated that as a result of the playground fight, J.N. received an in-school suspension, was assigned a seat in the auditorium during lunch, and was directed by Matozzo not to leave that seat for any reason.  (Id. at 189–90.)

With a reasonable degree of scientific certainty, based on her education, training, and experience in ABA, Dr. Russell made the following conclusions, in pertinent part:

1.     J.N.'s IEPs were not appropriate to support his needs, nor did they provide a FAPE in the LRE.

2.     HMS responded to J.N.'s targeted behaviors using in-school and out-of-school suspensions, punishment-based consequences, and contraindicated procedures.  These strategies were inappropriate and unsupported.

3.     J.N.'s last FBA was conducted in 2017; despite a change in placement (Y.A.L.E. to HMS), a change in classroom (6th to 7th grade at HMS), and two positive manifestation determinations following significant behavioral incidents resulting in suspension (December 2021 and April 2022), a new FBA was not conducted.

4.     The most recent behavioral observation cited in the IEP was dated June 2020 (note:  this appears incorrect, as the more recent observations were conducted in September 2020).

5.     Without conducting an FBA to determine why behaviors are occurring, using intentional punishment strategies in response to target behaviors can inadvertently reinforce the behaviors of concern, which will then increase in frequency, duration, and severity.

6.     The IEP does not list supports for school personnel.  BIPs cannot be rolled out without training, and staff at HMS were not trained.

7.     J.N. appears to be experiencing the adverse effects of trauma, including the improper use of restraints.

Dr. Russell stated in her report that Garfield and Hampton are inappropriate for J.N. because they cannot meet his academic needs; at the hearing she clarified that M.L. was the source of this information.  She made several recommendations for an appropriate program, including that a BIP be developed by a BCBA trained in trauma-responsive strategies and implemented by an RBT on a one-to-one basis, and that all caregivers, school staff, and parents receive training in how best to address J.N.'s behavior.  (Id. at 210.)

On cross-examination, Dr. Russell had no recollection of instances in which J.N. was physically aggressive, including toward his mother, of the basis for the Board's petition for emergent relief, or of his parents' attempts to place him in a residential facility in November 2021.

**Respondent M.L.** is J.N.'s mother.  She stated that the family moved to Haddonfield in September 2018, at which time J.N. was attending Y.A.L.E. School, Medford, New Jersey.  In fifth grade J.N. began at Y.A.L.E. School, Cherry Hill, New Jersey, and in January 2020 he was moved to Orchard Friends.  M.L. was not able to recall why he left Orchard Friends or if he spent some time on home instruction.

J.N. was enrolled at HMS in sixth grade in September 2020; Dr. Henderson "insisted on it." (T-2 at 196.) J.N. was placed in a GE class with ICS; pursuant to his IEP, he had a BIP and a one-to-one aide. Due to the COVID-19 emergency, HMS was using a hybrid model of attendance; J.N. was in school three and one-half days per week and on virtual/home instruction one and one-half days per week. All related services were provided virtually. A one-to-one aide was provided for in-school and remote instruction. M.L. agreed that the student population was lower in the school building during the fall of 2020.

In the spring of 2021, HMS permitted students with IEPs to return to school full time; J.N. returned full time and no changes were made in his IEP or BIP. M.L. could not state with certainty when HMS returned to full capacity. J.N. attended ESY in person. He had no suspensions for disciplinary infractions during the 2020–2021 school year.

All HMS students, including J.N., returned to school full time for the 2021–2022 school year. J.N.'s placement was again a GE class with ICS, a BIP and a one-to-one aide throughout the day, and related services. Respondents requested in-home ABA services but the District denied the request and, therefore, respondents retained Behavior Interventions, Inc.

In October 2021, at respondents' request and with their consent, Strobe emailed Matozzo to request a classroom observation. M.L. had no personal knowledge of this observation, other than that it was permitted. J.N.'s BIP was not modified based on input from Strobe.

On cross-examination, M.L. stated that she and T.N. never refused parental training offered by the District; at most they asked for the training to be scheduled based on their work calendars. Training was not provided.

When asked about her November 2021 application for J.N. to enroll in a residential facility, M.L. stated that a change in J.N.'s medication had caused "horrible side effects," which stopped after the medication was discontinued. She denied that he assaulted his sister in or around December 2021.

On December 9, 2021, M.L. was texted a copy of a video allegedly taken by an HMS student on the HMS playground during recess.[27]  M.L.'s daughter sent her the video; her daughter stated that it was sent to her by an HMS student.  M.L. described what she saw on the video:

> [S]tudent A was prompting student B, fight, fight, fight, and then there's [J.N.].  . . . Student B did the closed handed fist to the back of [J.N.'s] head, [J.N.] of course spun around . . . into a defensive posture[.]
>
> . . . They tumbled, the two of them, [J.N.] and student B were wrestling . . . windmill swinging, one's got one in a headlock, student B attempting to choke [J.N.] . . . [with a] hand around [J.N.'s] neck . . . and they wind up on the ground towards the end.  Two students broke it up.
>
> [T-2 at 162–63.]

As stated by other witnesses, J.N.'s IEP called for him to have an RBT with him at all times.  M.L. stated that Cass, J.N.'s one-to-one aide, is not seen on the video.  M.L. asked Cass where he was and he responded that he was on his break, in his car.  J.N. was given a one-day in-school suspension as a result of this incident, which he served on December 10, 2021.

Following this incident, M.L. showed Matozzo the cell-phone video, but could not recall if she gave Matozzo a copy.  M.L. filed a harassment, intimidation, and bullying (HIB) complaint with Matozzo, but never received a written response.  J.N. complained to M.L. on a weekly basis regarding harassment from other students, generally extreme verbal harassment which took place while his one-to-one aide was not present.  M.L. communicated with Matozzo about this, in-person, by email, and by text.

Respondents went to Matozzo's office to view the video of the December 16, 2021, incident in the HMS auditorium.  Matozzo and Dr. Henderson were present.  M.L. watched the video from about twelve inches away.  M.L. described the incident she saw depicted

---

[27]  While this video was later produced by respondents (see discussion below), it was not shown during M.L.'s testimony.

on the video, beginning with all the students, including J.N., being seated in assigned seats.  Her description is mostly consistent with the summary, below.

M.L. stated that on the video, Pennington used physical restraints twice with J.N.  She did not sign a consent form permitting the use of physical restraints.  She directed that J.N. not be restrained.  J.N.'s BIP did not include the use of physical restraints.  After this incident, M.L. revoked consent for Pennington to work with J.N.[28]

Based on her review of the video, J.N. was not trying to injure himself, nor was he trying to injure anyone else.  As a result of this incident no changes were made to J.N.'s BIP or IEP.  HMS suspended J.N. for ten days, from December 17, 2021, through January 7, 2022[29] as this was his second offense, the first being a "physical altercation with a peer" on December 9, 2021 (with the suspension served the next day).  (R-7.)

J.N. returned to school on January 10, 2022.  On January 11, 2022, the CST held an MDM and concluded that his behavior on December 16, 2021, was a manifestation of his disability.  The CST did not conduct an IEP meeting to amend his IEP.  The CST did not conduct a new FBA, nor did they amend his BIP.

Prior to J.N.'s return to school, respondents were required by Dr. Leren to obtain a letter from a mental-health professional stating that J.N. was not a danger to himself and/or others.  Dr. Mircetic, J.N.'s treating psychiatrist, gave this statement to the CST at the MDM and confirmed it in a letter dated January 20, 2022.  (J-12.)  Dr. Mircetic had treated J.N. for a number of years; about this time, he was seeing J.N. monthly to manage his medication.  Numerous times, the District requested permission to speak with J.N.'s treating mental-health professionals, and M.L. participated in multiple such calls with the District.

On April 13, 2022, the day of the CST meeting on the draft IEP, J.N. told M.L. of an incident at school.  In J.N.'s telling, he wanted to take a break and leave the classroom,

---

[28]  M.L. could not recall if she called the police or the State Department of Child and Protective Services regarding Pennington, but she did contact his employer, BDA.
[29]  Winter break ran from December 23, 2021, through January 2, 2022.

as is permitted in his IEP and BIP, but was denied the break requested.  In the altercation that ensued, Cass "stomped on his foot, causing his toe . . . to bleed." (T-2 at 183.) J.N. was suspended because of this incident.  An MDM was held, the behavior was determined to be a result of J.N.'s disability, but an FBA was not conducted, and neither his IEP nor his BIP was modified.[30]

M.L. researched the out-of-district schools proposed by the CST for J.N., and she has current and former clients placed in both.[31]  Neither school is an appropriate placement for J.N. because (1) neither provides an ABA-based program; (2) neither employs a clinical mental-health professional in the classroom; (3) Garfield in particular has experienced numerous violent incidents, rioting, fighting, and a shooting;[32] and (4) neither school can provide appropriate academic programming for advanced students.

M.L. stated emphatically that despite her position that HMS did not provide appropriate staff[33] to work with J.N., HMS—and soon, Haddonfield High School—is the only appropriate placement for J.N.

During cross-examination, counsel for the Board asked M.L. questions regarding events in and around December 2021, including the following:

> And weren't there reports from other students that [J.N.] was going around telling people that he had lots of guns in his house?
>
> [CourtSmart Audio, March 24, 2023, at 4:57:22–4:57:29.]

After M.L. said, "no," counsel asked whether M.L. had had such discussions with school officials.  Counsel for respondents then objected to the initial question on the grounds that it included a "highly prejudicial allegation" and requested an order compelling proof of the allegations, such being reports of HMS students making such statements.

---

[30] At this point, however, petitioner had filed an emergent petition to have J.N. removed to home instruction pending an out-of-district placement.

[31] M.L. received her B.A. in SE from Rowan University, Glassboro, New Jersey, and is certified as a teacher of the handicapped and as a school social worker.

[32] As M.L. stated, these incidents have been covered in local media.

[33] M.L. stated her understanding that BDA no longer is a contracted vendor with the District.

When asked if she had documentation to back up her question to M.L., counsel said yes, but not with her.  As M.L. had already answered the question regarding her son's alleged statements about guns, I directed counsel to continue and asked her to later provide me with documentation supporting the allegation that HMS students reported that J.N. stated that there were guns in his home.

Following a formal motion and response, I ordered petitioner to, by the date of summation, provide documentary proof of the basis for her question to M.L. regarding the allegation that J.N. had told other HMS students that there were guns in his home.[34] During the hearing of April 19, 2023, counsel stated that in December 2021 a parent had emailed HMS and the message included the line:  "He said there are guns at his house." Counsel further stated that this email with names redacted had been provided to respondents as of May 26, 2022.  A copy of the email to Matozzo with names redacted was submitted on May 31, 2023.[35]

**Video Evidence**

## 1. December 9, 2021, Video

As stated above, during the 2021–2022 school year J.N.'s sister was a student at HHS.  M.L. stated that during the school day on December 9, 2021, her daughter sent her—by cellphone—a video that was allegedly being shared by other students.  This video, which is approximately thirty-five seconds long, was allegedly taken on the HMS playground during school hours on December 9, 2021.  M.L. testified credibly that to the best of her knowledge, more than one student used a cell phone to film the incident, a fight between J.N. and another male student.

---

[34] By letter dated April 13, 2023, counsel for respondents requested the contact information for the students who allegedly made statements to HMS authorities regarding guns in the N. home.  This request was denied at the hearing on April 19, 2023.

[35] Respondents objected to this submission, apparently forgetting the reason for the submission.  No other witness testified as to this incident and petitioner did not pursue the theory that J.N. had access to guns, therefore the substance of the email was not further considered.

M.L. testified regarding what she saw on the video, including that the fight stopped when two male students pull J.N. and the other student (who instigated the fight) apart. Although Cass had previously testified that the video showed him pulling the boys apart, M.L. claimed he is not in the picture when the fight breaks up and gave her an explanation for his absence.  For this reason and because counsel for petitioner objected to M.L.'s testimony on the grounds that "the best evidence" rule would require the video be produced, (T-3 at 160), respondents were directed to produce the video.

Respondents gave testimony intended to authenticate the December 9, 2021, video prior to summations, following which petitioner made a formal objection.  Petitioner objected to admission of the December 9, 2021, video as not being properly authenticated; lacking a time and/or date stamp; tampered with and/or edited at the thirteen-second mark; and because no one with personal knowledge (other than Cass) testified as to the events on the video.  Further, there was no evidence as to who took the video and/or shared it on social media or by email or texts.  (Petitioner's Br. at 34-37.)

While I find implausible petitioner's suggestion (made during cross-examination of M.L.) that more than one fight may have occurred on the HMS playground,[36] I **FIND** that the tape is flawed and unnecessary, as there is other evidence in the record to corroborate much of M.L.'s testimony regarding the events depicted in the video.  Therefore, the December 9, 2021, video was not admitted and is not included in the file as transmitted.

Dr. Henderson stated that no HIB complaint was filed by respondents after this incident, though M.L. testified that she made such a complaint.  J.N. was disciplined for his role in the fight.  In the MDM report prepared in January 2022, the description of this incident includes that the fight was precipitated by an exchange of words at lunch between J.N. and the boy who hit him.  (R-7 at 082.)  Further, the report states:

> During recess, peer stroke [J.N.] in the back of the head and [J.N.] retaliated.  [J.N.] slapped a student in the face.  The other student then sought retribution and swung at [J.N.] and a fight between the two students broke out.

---

[36] See Tr. of May 31, 2023, at 20.

[Ibid.]

**2. December 16, 2021, Video**

On or about December 16, 2021, Matozzo showed M.L. and T.N. a video taken by a surveillance camera in the HMS auditorium on December 16, 2021, depicting an incident involving J.N., other HMS students, and several adults, including J.N.'s one-to-one aide.  Neither party initially showed the video during the hearing, but both presented witnesses who testified as to the incident allegedly captured on the video, and the witnesses were subject to cross-examination.  The testimony of the witnesses as to this incident was so different as to call into question either the response of the one-to-one aide to J.N.'s alleged misconduct or the characterization of the incident by the parents.

As a result of this incident, J.N. was suspended from school for ten days for an "assault."  (See R-6.)  The CST determined that his behavior was a manifestation of his disability yet did not conduct an FBA.  There was competing testimony regarding whether his BIP was modified.

Following motions, I issued two orders, ultimately concluding that the video of the December 16, 2021, incident in the HMS auditorium is relevant to the issue of whether the April 13, 2022, IEP provides J.N. with FAPE in the LRE, and is therefore admissible. The video was shown during the last day of the hearing.  A protective order was duly executed by the parties and issued on May 8, 2023, after which counsel for respondents was provided with a copy of the December 16, 2021, video.

In a sworn statement submitted in response to the emergent petition (April 2022), M.L. stated that on December 16, 2021 (during lunch), J.N. was sitting in the seat in the HMS auditorium to which Matozzo assigned him and from which Matozzo told him not to leave.  (R-8 at 086.)  She repeats this information to Dr. Russell in June 2022, adding that the seat assignment occurred immediately after his one-day suspension for fighting on the playground.  (R-19 at 190.)

The December 16, 2021, video was taken from a surveillance camera in the HMS auditorium and, therefore, there is only one version.[37]  On the video, I saw the following:

1.     When the video begins, J.N. is speaking with the male classmate sitting behind him and slightly to his left.  With no incident, J.N. turns back forward and pulls out his phone.  This exchange is repeated between J.N. and the male classmate on his right and then with the male classmate directly behind him.

2.     The student behind J.N. gets out of his seat and walks over to the third classmate, two seats to his right.  This third classmate is sitting one row behind and slightly to the right of J.N.

3.     All the male students in this section of the auditorium, in all the rows, are both eating and using their cellphones.  It is impossible to see what they are doing on their cellphones, except that they are not talking on the phones.  J.N. held his phone in his right hand, up at eye level, and his screen is likely visible to the classmates behind him.

4.     When the video starts, J.N.'s one-to-one aide, Pennington, is seen walking around the area in which the boys are seated.  Pennington takes a seat three rows behind J.N., two rows behind the third classmate and slightly to the left of both.  Pennington is seen looking at his phone, but is looking at J.N. when, at 2:06 of the video, the third classmate leans forward and appears to say something to J.N.  There is no audio, so it is impossible to know what was said.[38]

5.     J.N. turns quickly halfway toward the classmate and swings his arm toward the classmate, in a swatting motion.[39]

---

[37]  When called on rebuttal, Dr. Henderson identified the video and stated it was an authentic copy of the HMA surveillance video of the auditorium on December 16, 2021.
[38]  Pennington (in his written report on the incident) and M.L. stated that the third classmate commented on the video J.N. was watching.  (See J-3.)
[39]  Here, M.L.'s version is different; she states that J.N. held his hand up several times, as if to indicate "stop."  Otherwise, M.L.'s account is verified by the video.  Pennington's account is also different; he says J.N. swatted twice, not once as seen on the video.  (J-3 at 052.)

6.      The third classmate does not appear to have been hit.  His head does not snap back or to the side.  He moves back into his seat and goes back to his phone.  He does not appear to react or to say anything further to J.N.

7.      Pennington stands and leans over his seat; J.N. is half turned toward Pennington, appearing to listen to him.  Pennington makes a gesture that looks like "give it to me."  The third classmate turns when Pennington starts talking but is back on his phone before Pennington is done.

8.      Pennington walks to the row one in front of J.N.'s row, by which time J.N. is back on his phone, not paying attention to Pennington.

9.      Pennington points to the row two in front of J.N.  Then, Pennington asks the boy on the aisle in J.N.'s original row to move, apparently to let him by.  As the boy starts to collect his things and raise his desk, Pennington goes back to the row in front of J.N. and is pointing to the row two in front of J.N.

10.      J.N. is pointing at his own row and then continues eating.

11.      Pennington walks in front of J.N. and takes his backpack, moving it two rows ahead.

12.      J.N. now gets up, retrieves his backpack and tries to return to his original seat.  Pennington blocks him and appears to give J.N. the option of the new seat or leaving the auditorium.  They argue.  Pennington grabs J.N.'s jacket from his original seat; J.N. tries to grab it back.

13.      J.N. swings at Pennington;[40] they begin to wrestle, moving about the center aisle.  Eventually, Pennington gets J.N. on the ground in a restraint.

---

[40] Presumably, this is the action by J.N. that Dr. Henderson said justified the use by Pennington of physical restraint.  (See J-3; P-3 at ¶ 6.)

4.    An adult female walks over calmly, appears to speak to J.N., who is on the ground, under Pennington.

15.    Pennington gets up, J.N. continues to fight, swinging at Pennington.  A second restraint is applied.

16.    The boy on the aisle moves in, away from J.N. and Pennington.

17.    At 5:08, Matozzo walks into the auditorium and, as can be deduced by her body language, starts directing the rest of the students to leave.

18.    Once the students have mostly cleared out, Pennington stands up.  J.N. remains on the ground, kicking at Pennington.

19.    As Matozzo scrolls through her phone, J.N. crawls along the ground.  He grabs a single chair and holds it up over his head as if to throw it at Pennington, who grabs it and moves it away.

20.    J.N. stays on the ground, shouting at Pennington.  He crawls around the back of the seats, and after about four minutes, is seen talking on his phone.

21.    When the video ends, J.N. is still lying on the ground, talking on his phone.

## **FACTUAL DISCUSSION AND ADDITIONAL FINDINGS**

**Credibility Analysis**

For testimony to be believed, it must not only come from the mouth of a credible witness, but it also has to be credible in itself.  It must elicit evidence that is from such common experience and observation that it can be approved as proper under the circumstances.  See Spagnuolo v. Bonnet, 16 N.J. 546 (1954); Gallo v. Gallo, 66 N.J. Super. 1 (App. Div. 1961).  A credibility determination requires an overall assessment of the witness's story in light of its rationality, internal consistency, and the manner in which it "hangs together" with the other evidence.  Carbo v. United

46

OAL DKT. NO. EDS 03372-22

<u>States</u>, 314 F.2d 718, 749 (9th Cir. 1963).  Also, "'[t]he interest, motive, bias, or prejudice of a witness may affect his credibility and justify the [trier of fact], whose province it is to pass upon the credibility of an interested witness, in disbelieving his testimony.'"  <u>State v. Salimone</u>, 19 N.J. Super. 600, 608 (App. Div.), <u>certif. denied</u>, 10 N.J. 316 (1952) (citation omitted).

All witnesses, other than M.L., were cross-examined by opposing counsel regarding their preparation for testifying, including any assistance they may have received from counsel; assistance received and/or approval obtained in preparing certifications; and payment received and/or payment terms.  None of the answers given raised issues of the credibility of any witness.

Principal Matozzo was a credible witness.  She began her testimony seeming hesitant to describe J.N.'s behavior in graphic terms, but as the objections from counsel mounted, Matozzo's manner of responding changed.  She appeared to be bothered by the questions and did not hold back in her descriptions of J.N.'s behavior and, in particular, his frequent use of profanity in the school building.

Overall, because Matozzo was not part of the CST, she was a questionable choice.  Matozzo was asked repeatedly on cross-examination regarding her knowledge of the BIP implementation and record-keeping, which obviously annoyed her; she said more than once that those tasks were not part of her routine responsibilities.

For example, when shown J.N.'s April 27, 2021, IEP, for services beginning in his seventh-grade school year, Matozzo stated she was vaguely familiar with it.  She had no recollection of amendments to the April 27, 2021, IEP, but stated that she would not have been the one to make such a request.  Matozzo knew that J.N. had a BIP and knew that it was modified under the guidance of Mercado, (T-1 at 89), but has no recall of communications with Mercado nor of any discussion regarding implementing or modifying J.N.'s BIP.

After the December 16, 2021, incident, Matozzo spoke with Dr. Leren, the case manager, but could not recall whether they discussed the need to call an IEP meeting to modify J.N.'s BIP.  She did not recall discussing with Dr. Leren that the last FBA of J.N.

OAL DKT. NO. EDS 03372-22

was conducted in 2017, or that it should be updated.  Matozzo identified the draft IEP dated April 13, 2022, and recalled attending the IEP meeting on April 13, 2022, but does not recall much about the discussion, including the recommended placement.

Matozzo gave effective eyewitness testimony regarding J.N.'s emotional outbursts, but here the passage of time impacted her recollection.  She was in the auditorium on December 16, 2021, and saw the surveillance video at least once shortly afterward, but her recollection of what she saw was shown—by the video—to be somewhat inconsistent with what happened.  In particular, she stated—both on the stand and in her certification—that J.N. assaulted, "slapped," a male classmate.  (See J-10, ¶ 4.)  However, at the hearing, she stated that she arrived after the initial encounter between J.N. and the other student and this is confirmed by the video.  As explained further below, the video shows J.N. turning toward a classmate sitting behind him and waving his arm and hand toward the student, as if to swat him, but not actually touching him.  Pennington confirmed that J.N. did not slap the classmate.  (See J-3 at 052.)

Dr. Woldoff was professional and credible and handled the criticism by opposing counsel very well.  Where her testimony, and her report, fell short was both were based on records only, and an incomplete set of records at that.  For example, she refers to the video of December 16, 2021, as showing that J.N. assaulted a peer.  Had she watched the video, she would know that her description of the incident was not wholly accurate.  Further, she acknowledges that J.N. was examined by his treating psychiatrist after the December 16, 2021, incident, but neglects that this psychiatrist, Dr. Mircetic, stated that it was "appropriate and safe for J.N. to return" to HMS.  (See J-12.)

Dr. Woldoff conducted her record review in March 2023, almost one year after the District determined that J.N. could not receive a FAPE in the District and asked that he be removed on the grounds that by his behavior he is a danger to himself and to others.  In other words, she was not consulted at the time the Board's decision was made.  Dr. Woldoff reviewed records only and did not meet or speak with J.N., his parents, his teachers, or his aides (whether from BDA or those retained by his parents).  She is of the opinion that J.N. should not remain in his most recent placement, a GE class with ICS, but she also seemed to state that J.N. can remain in the District in a different placement,

notwithstanding her view that J.N. may not be well served academically in the District and needs more therapeutic support than is offered in the District.

Mercado offered general information regarding J.N.'s BIP but was unable to provide details, especially with respect to whether the BIP was modified during the 2021–2022 school year. Mercado did recall, however, specific discussions with M.L. and that he did not provide parent training after ESY.

While Mercado served as a resource for M.L. and T.N., there is no evidence that he did more for them than provide a sounding board. Mercado stated that J.N. made progress on his BIP, but he gave no testimony on how he helped J.N.—in his words—"develop skills to deal with variables in the environment." He also said that when the BIP was not working, he changed to "reinforcers that might be more motivating," but did not say he worked with J.N. to identify and control the negative emotions caused by environmental variables.

Mercado did effectively describe J.N.'s inappropriate behavior, a description confirmed by all other witnesses for the petitioner.

Mercado and Cass both stated that they were responsible to implement J.N.'s BIP and would have known if it were changed, and neither could recall any such changes. That is strong evidence that although they were collecting data on J.N.'s behavior, they either never found it necessary to make changes because J.N. was not acting inappropriately or they simply did not make changes despite J.N.'s inappropriate behavior. Given all the evidence that J.N. misbehaved during the 2021–2022 school year, the latter appears more likely.

Cass, like Mercado, was in frequent communication with respondents. His testimony regarding J.N.'s conduct, in and out of school, was for the most part consistent with the documentary record and other witness testimony. He stated that he tried de-escalation techniques with J.N., none of which were successful. Like Mercado, he did not describe techniques—other than transition warnings at the end of classes—to prepare J.N. to respond appropriately to pending changes in his environment.

Dr. Henderson was professional in her demeanor and handled all attempts by opposing counsel to criticize her expertise and decision-making with patience.  Where her testimony fell short was attempting to justify action by the CST, which she supervises, that cannot be excused.  On two occasions, the CST evaluated J.N.'s behavior in light of his disability and determined that his behavior in violation of the student code of conduct was a manifestation of his disability, yet the CST continued to rely on an FBA that was four years old.  Dr. Henderson tried to argue, using the school calendar, that some of the days on which J.N. was suspended were not "full days," and, therefore, an MDM was not required.   Setting that argument aside, once the manifestation determination was conducted, the CST then had an obligation to determine how to best respond, whether to conduct a new FBA and/or to modify the BIP.

Dr. Henderson also stated that an FBA was not necessary, as a behavioral observation had been conducted earlier in the year.  The only behavioral observation cited in any of J.N.'s IEPs was that conducted by BDA in August and September 2020, eighteen months earlier.  As she also testified, HMS in August and September 2020 was a different place, significantly less crowded due to the ongoing COVID-19 restrictions than it would be one year later with all students returning.  By December 2021, the inadequacy of the 2017 FBA and the 2020 behavioral observation (and, for that matter, the BIP and/or the means of implementing the BIP by BDA personnel) should have been apparent.

Strobe was an ineffective witness.  Petitioner moved to strike Strobe's testimony as vague and non-responsive and beyond the time period, as based on her testimony she may have not begun working with J.N. until after he was removed from HMS.  While the motion was denied, Strobe's testimony was practically useless.  Her refusal to commit to knowledge of almost anything besides that she did work with J.N. led her to make statements that were not credible.

For example, when asked if Matozzo responded to her request for an in-person observation of J.N., Strobe could not recall.  But she did remember observing J.N. in school, so Matozzo (or someone in her stead) must have permitted Strobe to come into the classroom.  Strobe could not recall when she started working with J.N., surmising it may have been summer 2022.  But by deduction alone, if she observed J.N. in the

classroom, she must have started working with him prior to the summer of 2022, because he has not been in an HMS classroom since late April 2022.

Smith, on the other hand, was a credible witness but did not offer much relevant information other than that J.N. has improved during the time she has worked with him. Though respondents should be credited for continuing a program of behavioral therapy for J.N. while he has been on home instruction, learning how to behave outside the school setting may not be of much help, as J.N. struggles to regulate his behavior in school.

Smith made the surprising statement that the behavior plan that she uses with J.N. does not include working on transitions.  Given that J.N.'s difficulty with transitions was cited by all the District witnesses, this may simply underscore the absence of collaboration between the CST and outside therapists.

## Additional Findings

Based on due consideration of the testimonial and documentary evidence described above, and having had the opportunity to observe the demeanor of the witnesses and assess their credibility, I **FIND** the following **FACTS**:

1.      J.N.'s disability, autism, impacts both his mastery of academic subjects and his behavior.  Despite his disability, he has performed well academically, especially in subjects in which he has a strong interest.  The description of J.N. found in his IEPs by his subject-matter teachers is startlingly different from that of the boy described in the Behavioral Incident Forms.  When engaged and interested, J.N. exhibits focused and positive behavior.

2.      J.N. does not excel in all his academic classes; he is less interested in (or may have more trouble mastering the concepts of) science and math and has difficulty in reading comprehension (consistent with his difficulty to understand others' points of view).  In their comments, his teachers note that J.N. struggles with topics that are not of his interest.

OAL DKT. NO. EDS 03372-22

3.      J.N.'s ability to handle the <u>academic</u> rigor of HMS, and to his parents' minds, of HHS, is no guarantee that he will be successful unless he can similarly learn to master <u>social</u> challenges and to regulate his emotions.  Without such mastery, J.N. will be unable to reach all his educational goals and, eventually, be accepted in broader society.

4.      J.N.'s parents stated credibly that he has friends at school whom he has missed this past year.  At the same time though, if M.L. is to be believed, and I find her credible on this, J.N. was a regular victim of bullying.  Middle-school bullies must be disciplined, but if J.N.'s behavior does not change, he will continue to be a target of students who are looking for attention by picking on a vulnerable peer.

5.      The April 27, 2021, IEP and BIP gave J.N. the option of transitioning from class to class with his peers (and Mercado and Cass confirmed this practice). There was no evidence,[41] however, that J.N. was first taught <u>how</u> to perform such a transition by, for example:  watching other students moving through the halls; discussing the emotions that could/would result; discussing methods of handling such emotions; discussing strategies that J.N. could employ if he felt crowded, hurried, anxious, or scared; and discussing behaviors to avoid in the halls, such as pushing, running, yelling, or cursing.

6.      The main transitions described by petitioner's witnesses were from class to class, or room to room (and Smith stated that she does <u>not</u> work with J.N. on transitions).  This suggests a focus on too few transitions; J.N. also needs to learn how to respond to the myriad of changed circumstances he faces throughout the school day.

7.      There were many more school days in the 2021–2022 school year in which J.N.'s behavior did <u>not</u> result in an incident meriting a write-up or discipline, but

---

[41]  The BIP does include as an intervention "prepare J.N. as much as possible as to what is coming next and what is expected behaviorally," but there was no discussion of any such "preparations" for circumstances in school by Mercado, Cass, Strobe, or Smith.

there was little testimony regarding the interventions that were successful and/or how such achievements were incorporated into his BIP.

8.      J.N. was not well served by the RBTs assigned to him during the 2021–2022 school year.  There is sufficient evidence—testimonial and documentary—that on December 9, 2021, J.N. and a classmate argued in the lunchroom/auditorium.  There is no evidence that Cass prepared J.N. for the transition from lunch to recess and the possibility that the argument could follow the boys to the playground.

9.      There is sufficient evidence, without consideration of the playground video, that as a result of the December 9, 2021, incident, J.N. received an in-school suspension and was assigned by Matozzo to a specific seat in the auditorium during lunch.  There is no evidence that Pennington, the substitute RBT, was aware of the seat assignment or the reason for the seat assignment, even though both Mercado and Cass stated that Pennington was "fully briefed" on J.N.'s day.

10.     The December 16, 2021, video shows that J.N. was provoked by the classmate behind him; Pennington wrote in the Behavioral Incident Form that the classmate was commenting on J.N.'s cell-phone screen.  The BIP gave Pennington many strategies to choose from, including to ignore the behavior, which may have been the most appropriate as the video shows that both boys went back to their phones.  Instead of punishing J.N. (and creating more anxiety for him), by removing him from his <u>assigned</u> seat while the other boy stayed put, Pennington could have sat next to J.N. or in front of him to prevent escalation (though at this point, J.N. was not continuing to exhibit target behaviors).  Pennington could then have kept J.N. back when the rest of the students left the auditorium to discuss the classmate's comment, J.N.'s response and more appropriate responses, and the pending transition to the playground, where J.N. was pulled into a fight just one week earlier.

11.     A goal of J.N.'s April 27, 2021, IEP is "when prompted," he "will accurately identify his own emotions/feelings (e.g., anxiety, stress, frustration, anger,

sadness), the intensity of those emotions/feelings and strategies for dealing with those emotions/feelings[.]"  (J-2 at 13.)  In the incident reports, the RBTs do not state that they prompt such discussions but do record their correction of wrong action by J.N. or that they repeat directions that have been given by another adult. There is no description in any report of action taken by the RBT to prepare J.N. in advance for a situation in which he is known to experience stress or to act out, and if/when J.N. acted in an aggressive and/or inappropriate behavior, how or why such preparation was insufficient.

12.     Based on the few scenes from J.N.'s home life that were described in this proceeding, it is evident that he faces many transitions at home and does not handle them without incident.  J.N. moves from one parent's home to another, from home to school and back, to preparing to leave for several days to stay with his father, to seeing doctors, to extracurricular activities.

13.     At least initially, J.N.'s parents and the CST, including BDA staff, agreed with respect to J.N.'s behavior.  M.L. was very forthcoming in her communication with the CST regarding her difficulties with J.N. in the home and as to her desire to find an alternative placement for him, including a residential setting.

14.     Dr. Woldoff was not consulted by the District prior to the decision to remove J.N. from HMS on the grounds that he is a danger to himself and to others. Petitioner did not introduce another mental health expert to testify about consultation with the CST at the time the disputed IEP was proposed.  In other words, petitioner made the decision that J.N. is a danger to himself and to others without the input of a mental-health professional.

15.     After the most troubling incident, that of December 16, 2021, the only mental-health professional to see J.N., Dr. Mircetic, stated that J.N. should return to the classroom and that it would be safe for him to do so.

16.     The CST met on January 11, 2022, to modify J.N.'s BIP.  The twenty-two requests of M.L. for programming and staffing changes underscore that she and

OAL DKT. NO. EDS 03372-22

T.N. were resisting an out-of-district placement while simultaneously demanding the type of services that cannot be effectively provided by a large public school (e.g., daily BCBA assistance, two-to-one aides, social-skills training with similarly disabled peers, private spaces in the building, personal sensory materials).

17. J.N. acted in an aggressive and impulsive manner (both in school and at home) after returning to school in January 2022. His in-school behavior was worse in April 2022 than it had been previously (other than December 16, 2021). No testimony was given regarding the reason or potential reasons for such an increase that month.

19. J.N. frequently "eloped," leaving school prior to the end of the day to walk home. His parents knew about this behavior, permitted it, and sometimes encouraged it. Both BDA and HMS staff saw J.N. leaving school early as an effective means to prevent escalation of his negative behaviors.

20. The most recent educational evaluations of J.N. are at least three years old; some are older. The most recent FBA was conducted almost six years ago. The most recent behavioral observation was conducted close to three years ago.

21. The Board failed in its obligation to re-evaluate J.N. in light of his behavioral issues that were not controlled by the BIP developed primarily using observations of J.N.'s behavior when he started at HMS with a COVID-reduced student population.

22. Given the age of his evaluations, the CST will be hampered in any attempt to design an appropriate program for J.N., whether at HHS or in an out-of-district setting.

23. J.N. needs a program and placement that will serve him academically and where he will be supported therapeutically. There was no direct evidence that either Garfield or Hampton will meet all his needs.

OAL DKT. NO. EDS 03372-22

## **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

This dispute centers on the April 13, 2022, IEP that changed J.N.'s placement from a GE classroom with ICS to a private day school for children with disabilities with home instruction pending acceptance at one of two recommended out-of-district schools.  It is the Board's burden to show that it was appropriate, at the time it was proposed, to meet J.N.'s individual needs and that the IEP was designed to confer meaningful education benefit on J.N. in the LRE.  Further, the Board alleges and therefore must prove that continuing J.N. in his most recent educational placement at HMS, and subsequently at HHS, is "substantially likely to result in injury to the child or to others" in the school environment.  20 U.S.C. § 1415(k)(3)(A).

As a recipient of federal funds under the IDEA, the State of New Jersey must have policies and procedures that assure all children with disabilities the right to a FAPE.  20 U.S.C. § 1412.  State regulations track this requirement that a local school district must provide FAPE as that standard is set under the IDEA.  N.J.A.C. 6A:14-1.1. All students with disabilities from age three through twenty-one must be provided a free, appropriate special education and related services that:  a) have been provided at public expense, under public supervision and direction, and without charge; b) meet the standards of the State educational agency; c) include an appropriate preschool, elementary-school, or secondary-school education in the state involved; and d) are provided in conformity with the IEP required under 20 U.S.C. § 1414(d).  20 U.S.C. § 1401(9); N.J.A.C. 6A:14-1.1 et seq.  The responsibility to deliver these services rests with the local public school district.  N.J.A.C. 6A:14-1.1(d).

In order to provide a FAPE, a school district must develop and implement an IEP for every student eligible for SE and related services.  N.J.A.C. 6A:14-3.7.  An IEP is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 368 (1985).  An IEP should be developed with the participation of parents and members of a district board of education's CST who have participated in the evaluation of the child's eligibility for SE and related services.  N.J.A.C. 6A:14-3.7(b).  The IEP team should consider the strengths of the student and the concerns of the parents for enhancing the education of their child; the results of the initial or most recent evaluations of the student; the

student's language and communications needs; and the student's need for assistive-technology devices and services.  The IEP establishes the rationale for the pupil's educational placement, serves as the basis for program implementation, and complies with the mandates set forth in N.J.A.C. 6A:14-1.1 to -10.2.

In an administrative due-process hearing to challenge or support a proposed IEP, the school district bears "the burden of proving the appropriateness of the IEP it has proposed." Carlisle Area Sch. v. Scott P. by & Through Bess P., 62 F.3d 520, 533 (3d Cir. 1995); N.J.S.A. 18A:46-1.1.  The IDEA does not require the Board to provide J.N. with the best possible education, S.H. v. State Operated Sch. Dist. of Newark, 336 Fed. 3d 260, 271 (3d Cir. 2003), but must provide personalized instruction with sufficient support services to permit J.N. to benefit educationally from instruction.  Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982).

The IDEA also requires states to educate disabled children in the LRE, to the maximum extent appropriate, with children without disabilities.  See 20 U.S.C. § 1412(a)(5)(A).  Thus, removal of children with disabilities from the GE environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  Ibid.  "[T]his provision sets forth a 'strong congressional preference' for integrating children with disabilities in regular classrooms."  Oberti v. Bd. of Educ. of Clementon Sch. Dist., 995 F.2d 1204, 1213–14 (3d Cir. 1993) (citations omitted).

To determine whether a school is in compliance with the Act's mainstreaming requirement, a court must first determine whether education in the regular classroom with the use of supplementary aids and services can be achieved satisfactorily.  Id. at 1215.  If such education cannot be achieved satisfactorily, and placement outside of the regular classroom is necessary, then the court must determine "whether the school has made efforts to include the child in school programs with nondisabled children whenever possible."  Ibid.  This two-part test is faithful to the Act's directive that children with disabilities be educated with nondisabled children to the maximum extent appropriate.  Ibid.

Before placing a child outside the district, "the school 'must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction,' speech and

language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disabilities." Oberti, 995 F.2d at 1216 (citation omitted).  The following language of the Oberti court is particularly applicable here:

> In passing the [IDEA], Congress recognized "the importance of teaching skills that would foster personal independence . . . [and] dignity for handicapped children."  Learning to associate, communicate and cooperate with nondisabled persons is essential to the personal independence of children with disabilities.  The Act's mainstreaming directive stems from Congress's concern that the states, through public education, work to develop such independence for disabled children.
>
> [Id. at 1216 n.23 (citation omitted).]

Here, the April 27, 2022, IEP is not meaningful.  The evaluations on which it relies were outdated in 2022, much less now, one year later.  The classes in which J.N. has continued to excel are those, as discussed above, in which he is interested and, therefore, is able to maintain focus and respond favorably.  There is no question that J.N. will be unable to achieve academic success in all subjects until he is better able to control his negative behaviors.  Given the insufficient support he was provided by the staff of BDA, it is hard to reliably determine whether the fault is with the BIP as proposed or as implemented, or whether the absence of a recent FBA made it impossible for the CST, including the BCBA, to determine the most effective strategies for J.N.[42]

Petitioner argues that the April 27, 2022, IEP "must be analyzed given the information available, and reasonableness of the decision made at the time of the decision."  (Petitioner's Br. at 22 (citing Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995)).)  At the time the decision was made, the only recent professional opinion that the District had available was that of Dr. Mircetic, who stated, on the same page on which he detailed J.N.'s complex diagnosis, that J.N. could safely return to HMS.

---

[42] Petitioner's witnesses, particularly Dr. Henderson, repeatedly stated that a new FBA was not necessary, as they already knew the reasons for J.N.'s behavior.  Based on the record, I am not so convinced.

Petitioner conceded that the April 27, 2022, IEP was intended to be amended once J.N. was placed out-of-district.  Likely for that reason, petitioner spent little time at the hearing on evidence that this IEP would provide significant learning,[43] relying instead on proving that J.N. cannot return to HMS (or HHS), as his behavior allegedly is a threat to the safety of himself and others.  I, however, **CONCLUDE** that the proofs do not demonstrate that continuing to allow J.N. to attend school in the District is substantially likely to result in injury to him or others in the school setting.

I **CONCLUDE** that while J.N.'s conduct in school during the 2021–2022 school year was inappropriate and disruptive, there was no contemporaneous expert support for the Board's request for relief, and no support from a professional who examined him.  To the contrary, J.N. has been under the care of Dr. Mircetic for several years, including prior to and following some of the most troubling conduct recounted by the evidence, and Dr. Mircetic directed that J.N. be returned to HMS in a GE classroom, and answered the critical question of whether J.N. is a threat to himself or others in the negative.

Everyone who testified in this matter, including M.L. and certainly Dr. Woldoff, expressed concerns about J.N. and his behaviors.  His parents have long recognized that J.N.'s disability impacts his behavior in a negative manner, which has prevented him from accessing his education, and in the past his parents have chosen to enroll J.N. in private schools where they hoped he could obtain both challenging academic instruction and therapeutic supports.  To date, finding that mix has been difficult.

In determining that I am unable to grant the relief sought by the Board, I am guided by the express statutory language contained at 20 U.S.C. § 1415(k)(3)(A).  Our courts assume that the drafters of a statute intended to ascribe to words their ordinary meaning. Jablonowska v. Suther, 195 N.J. 91, 105 (2008).  Moreover, and importantly, a court should strive for an interpretation that gives effect to all of a statutory provision, and does not render any language inoperative, superfluous, void, or insignificant.  State v. Reynolds, 124 N.J. 559, 564 (1991).  The standard that must be met under the statute is thus an intentionally difficult one, as it requires a showing that a child is "substantially"

---

[43]  To be fair, there was little dispute that somehow, while only accessing the classrooms remotely, J.N. has continued to thrive academically.

likely to harm himself or others if not removed from his school setting. The only mental-health professional to examine J.N. did not give that opinion. Dr. Woldoff concludes that J.N. is a "safety risk" based on records only and appears to agree that the most significant records, behavioral evaluations of J.N. by professionals, are outdated. Without question, the evidence shows that J.N.'s behavior, especially his disruption of his own and neighboring classrooms with uncontrolled profanity, has a negative impact on the educational environment of other students. That alone, however, is not enough to prevent him from attending school in the district.

The use of the word "substantially" and the high standard set by that language harmonizes with the overriding statutory preference for educating J.N. in the "least restrictive environment." 20 U.S.C. § 1412(a)(5)(A) mandates that

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Returning J.N. to the District will not be enough; the parties must take action that is long overdue and which I ordered in November 2022, the full reevaluation of J.N. by school personnel and outside professionals retained by the District with the consent of the parents. This reevaluation must include an assessment by a professional specializing in dual exceptionality, children who are gifted (as J.N. appears to be in certain academic subjects) and disabled. The conclusions of such an expert may include recommendations for a placement, whether in-district or in a private school, that is acceptable to both parties.

The parents must not interpret the phrase "with the consent of the parents" as giving them veto authority over the District personnel and outside professionals chosen by petitioner to conduct J.N.'s assessments. As stated in my December 7, 2022, final decision: Should the parents disagree with the results of evaluations conducted by the

District, the procedures provided at N.J.A.C. 6A:14-2.5(c) will be available, and the parents may then renew their request for independent educational evaluations.[44]

This school year is over, but the ESY program at HMS offers an appropriate means for the re-integration of J.N. into the public-school setting, which is critical, as he will be entering high school in the fall.  Further, he will be available for evaluations, including the FBA, which must be conducted in a school setting.

Finally, respondents are cautioned not to interpret this decision as finding that the concerns raised by school personnel are unreasonable.  Without the proper supports in place for J.N., it appears likely that the parties will be before this forum again to address the issue of J.N.'s ability to safely continue to attend school.  This decision should not be interpreted as precluding the Board from taking any action authorized by law moving forward that it deems necessary to preserve J.N.'s safety or that of the school community.

## **ORDER**

Based on the foregoing, together with the record as whole, I **ORDER** that the petition of Haddonfield Borough Board of Education seeking removal of J.N. from the District and interim placement on home instruction pending his acceptance and placement at an out-of-district school, including Garfield Park Academy and/or the Hampton School, is **DISMISSED** and I **ORDER** that J.N. be returned to the District, beginning with enrollment in the ESY program at HMS (or HHS) as set forth below.

The parties are **ORDERED** to meet with the CST to discuss J.N.'s ESY programming no later than seven calendar days from the date of this decision with an enrollment date of July 10, 2023.

---

[44] Haddonfield Boro. Bd. of Educ. v. M.L. & T.N. on behalf of J.N., OAL Dkt. No. EDS 05258-22, and M.L. & T.N. on behalf of J.N. v. Haddonfield Boro. Bd. of Educ., OAL Dkt. No. EDS 05882-22, Final Decision (December 7, 2022).

OAL DKT. NO. EDS 03372-22

Respondents are **ORDERED** to immediately provide consent to a full set of educational and behavioral evaluations and petitioner is **ORDERED** to immediately schedule such evaluations to be completed no later than August 4, 2023.

Pending completion of the above-described educational and behavioral evaluations, J.N. must be supported at ESY by an RBT, a school counselor, and a BCBA. Upon completion of all District evaluations described above, including an evaluation of potential dual exceptionality, respondents shall meet with other members of the CST no later than August 11, 2023, to discuss J.N.'s program and placement for the 2023–2024 school year, whether at HHS or at a private school agreed to by the parties.

This decision is final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2022) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a district court of the United States.  20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516 (2022).  If the parent or adult student feels that this decision is not being fully implemented with respect to program or services, this concern should be communicated in writing to the Director, Office of Special Education Programs.

June 29, 2023
DATE

**TRICIA M. CALIGUIRE**, ALJ

Date Received at Agency:

June 29, 2023

Date Mailed to Parties:

TMC/kl

62

OAL DKT. NO. EDS 03372-22

## APPENDIX

## EXHIBITS

**Joint Exhibits:**

J-1     Certification of Dr. Carmen Henderson, Director of Special Education

J-2     Individualized Education Plan (4/27/21 Annual Review and 6/17/2021 Amendment Agreement without Meeting) (also R-2)

J-3     Post Restraint Form (12/16/21 incident)

J-4     Behavioral Incident Form (4/6/22 incident)

J-5     Behavioral Incident Form (4/8/22 incident)

J-6     Behavioral Incident Form (4/13/22 incident)

J-7     Email from Conklin to Matozzo dated April 13, 2022 (4/13/22 incident)

J-8     Individualized Education Plan (4/13/22 Annual Review)

J-9     Email from M.J.L. to Dr. Henderson, dated April 13, 2022

J-10    Certification of Tracy Matozzo, Principal of Haddonfield Middle School

J-11    Certification of Dr. Kristin Leren, Case Manager

J-12    Report of Dr. Marko Mircetic, dated January 20, 2022

**For Petitioner:**

P-1     Certification of George Mercado, M.S., BCBA

P-2     Supplemental Certification of Dr. Kristin Leren

P-3     Supplemental Certification of Dr. Carmen Henderson

P-4     Text messages (March 27 and 29, 2022)

P-5     Emails from parent to Tracy Matozza, dated April 25 and 26, 2022

P-6     Email from parent to Dr. Leren, dated November 24, 2021

P-7     Letter from KidsPeace, dated November 24, 2021

P-8     CP1, Blue Card for Timothy Cass, completed the CPI Nonviolent Crisis Intervention Training

P-9     Certificate of Successful Completion for Registered Behavior Technician

P-10    Certificate of Completion for Safe Crisis Management Staff Certification Training

OAL DKT. NO. EDS 03372-22

P-11   Garfield Park Academy Clinical Services

P-12   Hampton Academy School Programs

P-13   Email from M.J.L. to Matozzo, dated March 30, 2022

P-14   Email from Matozzo to M.J.L., dated April 8, 2022

P-15   Emails related to Hampton and Garfield intake dates

P-16   Email from Leighton to Henderson and Matozzo re: logging in

P-17   Log-In Record

P-18   Suboleski emails re:  Missing Work

P-19   Ettinger emails re:  Counseling

P-20   Carroll emails re:  Occupational Therapy

P-21   Connelly emails re:  Speech Therapy

P-22   Cardinal Kids Occupational Therapy Evaluation (October 5, 2013)

P-23   Partners in Learning Functional Behavior Assessment (March 17, 2017)

P-24   Neurobehavioral Assessment Center of South Jersey Neuropsychological Evaluation (June 2018)

P-25   Partners in Learning Functional Behavior Assessment Updated Report (October 19, 2018)

P-26   Brett DiNovi & Associates Behavioral Observation (June 2019)

P-27   Invitation for Reevaluation Planning Meeting (December 6, 2019)

P-28   Reevaluation Planning—Proposed Action (January 10, 2020)

P-29   Reevaluation Eligibility Determination with IEP (January 10, 2020)

P-30   Request for Additional Assessment—Proposed Action and Consent for Psychological and Educational Evaluations (January 10, 2020)

P-31   Haddonfield Psychological Evaluation (February 24, 2020)

P-32   Haddonfield Educational Assessment (February 22, 2020)

P-33   Email—Psychological Evaluation (March 13, 2020)

P-34   Email—J.N. reeval/elig/IEP (January 13, 2020) & Learning Evaluation (February 24, 2020)

P-35   Request for Additional Assessment-Proposed Action and Consent for Behavioral Observation (July 29, 2020)

P-36   Brett DiNovi & Associates Behavioral Observation and Preliminary Behavioral Recommendations (August/September 2020)

P-37   Brett DiNovi & Associates Behavioral Observation (September 2020)

P-38   CHOP Psychiatric Diagnoses from Dr. Marko Mircetic (January 20, 2022)

P-39   May 2022 Request for Independent Educational Evaluation

P-40   District's expedited due-process hearing and emergent-relief filing

P-41   Parents' answer to the District's petition

P-42   Order on Emergent Relief

P-43   Final Decision Motion to Dismiss

P-44   Reevaluation Plan

P-45   Parent December 23, 2022, email

P-46   District's January 28, 2023, letter

P-47   Parent's January 31, 2023, email

P-48   Parent's February 22, 2023, email

P-49   Letter from respondents' attorney

P-50   Dev's February 27, 2023, letter to ALJ Caliguire

P-51   Certification of Henderson regarding home instruction

P-52   C.V. of Dr. Sarah Woldoff

P-53   Expert Report of Sarah Woldoff

P-54   2021–2022 Haddonfield Middle School Calendar

P-55   Email from Leren to M.L. dated December 15, 2021 and Request for Additional Psychiatric Assessment

P-56   December 16, 2021, Surveillance Video from HMS Auditorium

**Respondents:**

R-1   Individualized Education Plan (4/27/21 Annual Review and 6/17/2021 Amendment Agreement without Meeting) (also J-2)

R-3   M.L.'s Objection to placement change, dated April 13, 2022

R-4   MDM, dated May 6, 2022

R-5   M.L. Statement, dated May 1, 2022

R-6   J.N. Discipline Record for the year 2021-2022

R-7   MDM, dated January 12, 2022

R-8   J.N. Response to E.R., dated April 29, 2022

R-10   IEE OT assessment, dated October 5, 2013

R-11   IEE FBA, dated February 22, 2017

R-12   IEE NEURO-PSYCH, dated June 7, 2018

OAL DKT. NO. EDS 03372-22

R-13   IEE FBA, dated October 19, 2018

R-14   BOE Behavior Observation, dated July 1, 2019

R-15   BOE Education Assessment, dated February 22, 2020

R-16   BOE School Psychological, dated February 24, 2020

R-19   IEE FBA, dated June 15, 2022

R-20    Dr. Russell's C.V.

R-21    Dr. Russell's bill

R-22    Rebecca Smith's C.V.

R-23    Alexis Strobe's C.V.

R-24   Dr. Russell's amended report

RX-1   Individualized Education Plan of L.T., dated October 19, 2018